Rehearing in banc granted, panel opinion vacated
under Local Rule 35(c), January 13, 2005

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RUTILIO LOPEZ-SOTO,
                        *Petitioner,*

v.                                                      No. 03-1331

JOHN ASHCROFT, Attorney General,
                        *Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A77-693-585)

Argued: June 3, 2004

Decided: September 20, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

---

Petition denied by published opinion. Judge Gregory wrote the majority opinion, in which Judge Niemeyer joined. Judge Michael wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** James M. Sullivan, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Petitioner. Victor Matthew Lawrence, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Steven H. Goldblatt, Director, Abigail V. Carter, Supervising Attorney, Michelle Correll, Harsh Trivedi, Student Counsel, Appellate Litiga-

tion Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Petitioner. Peter D. Keisler, Assistant Attorney General, Civil Division, Mary Jane Candaux, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

**OPINION**

GREGORY, Circuit Judge:

Rutilio Lopez-Soto (hereinafter "Petitioner" or "Lopez-Soto") petitions for review of the Board of Immigration Appeals' (the "BIA") order denying his asylum request and denying him relief pursuant to the Convention Against Torture. Petitioner is a native and citizen of Guatemala who entered the United States in 1999, having fled Guatemala with his cousin because the gang Mara 18 posed a threat to their lives. Previously, Mara 18 killed Petitioner's older brother, and gang members threatened to kill Lopez-Soto, his other brother and his cousin if they did not join the gang. As Petitioner and his cousin attempted to flee to the United States, his cousin was apprehended by Mexican authorities then deported to Guatemala. Shortly after the cousin returned to Guatemala, Mara 18 murdered him as well.

While it is clear that Petitioner has an objectively reasonable fear for his life if he is to return to Guatemala, the BIA's determination that Petitioner was not persecuted "on account of" his familial membership is supported by substantial evidence. Accordingly, we must deny Petitioner's asylum claim. Furthermore, we find that the BIA properly rejected Petitioner's Convention Against Torture claim. For the detailed reasons that follow, we deny the petition for review.

I.

A.

Petitioner was born in Quesada, Jutiapa, Guatemala in 1982. When he was eight-years-old, members of Mara 18 — a violent street gang formed in Los Angeles, California, but which now also has a strong

presence in Honduras, El Salvador and Guatemala[1] — recruited and harassed his two brothers, Edgar (then twenty-two) and Rubilio (then twenty). Both brothers had served in the Guatemalan army, and Mara 18 believed that they had military training and access to weapons. The Mara 18 threat, as is consistent with the gang's practice, was to join or die. Both brothers refused to join.

In April 1990, members of Mara 18 killed Edgar by stabbing him eighteen times at Rio de Paz, a town in Jutiapa. Witnesses to the death notified his family and identified the two killers. Petitioner's father filed a police report in May 1990, stating the names of the individuals believed to be the killers. The killers were never apprehended. Petitioner's father declined offers from Edgar's military friends to "take care" of the killers.[2] After receiving letters from Mara 18 threatening his life, Rubilio fled to the United States. In his affidavit filed before the IJ in Petitioner's case, Rubilio stated: "Because of my family's continued opposition to Mara 18, gang members have targeted young male members of my family for recruitment. . . . Because of our continued resistance, Mara 18 has threatened and attempted to kill off the young male members of my family." J.A. 45-46 ¶ 5.

In January 1999, after Petitioner turned sixteen, the first incident in which Mara 18 threatened Petitioner occurred when members of the gang threatened Petitioner and his cousin, Elmer Estuardo Lopez Mejia ("Elmer") in a park. In his affidavit,[3] Petitioner stated that when members of Mara 18 confronted and threatened Petitioner and Elmer

---

[1]*See generally* Rupert Widdicombe & Duncan Campbell, *Poor Neighbours Fall Prey to US Gang Culture: Central America Counts Cost of Deadly Export From Los Angeles*, The Guardian (London), May 28, 2003, at 12 (discussing "two major international [gang] 'franchises,'" the "MS (Mara Salvatrucha) and the Mara 18" and the fact that their local branches in El Salvador, Honduras and Guatemala "are involved in major crime from smuggling drugs and weapons, to kidnapping and carjacking").

[2]Petitioner and his entire family are deeply religious and opposed to the violence which plagues their country. Petitioner concedes that he is not asserting that he is being persecuted because of his religious beliefs. IJ Oral Decision at 9 (J.A. 505) (hereinafter "Oral Decision").

[3]Regarding this incident, the Immigration Judge ("IJ") made a factual finding that members of Mara 18 told Petitioner and Elmer to join the gang or "they would be killed like [Edgar] was killed." Oral Decision at 7 (J.A. 503). This finding contradicts Petitioner's affidavit in support of his asylum petition, *see* J.A. 16-17, as well as his testimony before the IJ, *id.* 412-14.

in the park, the boys, fearing violence, falsely said that they were "going to think about [joining the gang]" so that the gang would let them leave the park. *Id.* at 16. He also stated that his "parents were terrified that if I left the house, I would be killed like Edgar." *Id.* During his testimony before the IJ, Petitioner recounted the park incident similarly and stated that when he told his parents about it, "they remembered what happened to my brother." *Id.* at 412-15.[4]

After this incident, the gang made continuous threats. During the summer of 1999, Mara 18 mailed the boys threatening letters at their homes. The IJ found that the letters stated the boys could either "join [Mara 18] and have everything, or refuse and you will be killed." *Id.* The IJ further recognized that Petitioner and his father "both feared that [Petitioner] would be killed by [Mara 18], as his brother had been killed in 1990." *Id.*

### B.

Because of such fears, Petitioner's father and Elmer's parents arranged for the boys to flee Quesada, with the intention of fleeing Guatemala entirely. In September 1999, Petitioner and Elmer drove seven hours (roughly northeast) to the city of Puerto Barrios, Guatemala to stay with a friend of Petitioner's father while the family arranged for the boys to leave the country. The boys stayed in Puerto Barrios for approximately one month, and Petitioner did odd jobs while there to support himself. During that time in Puerto Barrios, Petitioner did not have personal trouble with Mara 18. However, while he was in Puerto Barrios, Petitioner's parents received two more threatening letters, the last one of which stated that Petitioner would be stabbed like Edgar if he did not join the gang and warned him that attempts to escape would be futile.[5]

---

[4]Thus, the record reflects that Petitioner merely testified that *his parents* were worried that he would be killed by the gang like his brother, not that the gang mentioned his brother Edgar while threatening him in the park.

[5]While the record is somewhat unclear, this last letter arrived after Petitioner had left for Puerto Barrios in September 1999 but before he fled to Mexico in November 1999. *See* J.A. 17-19.

On November 2, 1999, the boys left for the United States, traveling northward through Mexico. The boys attempted to avoid Mexican Immigration authorities because they feared being deported. On November 16, 1999, at a bus stop in Oaxaca, Mexico, immigration officials stopped the boys for questioning. Petitioner escaped by running, but Elmer was caught and deported. Petitioner continued onward to the United States, and he was detained by INS near the Texas border on December 22, 1999.

On January 10, 2000, while in INS custody, Petitioner spoke with his parents by phone, and they informed him that Elmer had been deported and killed by Mara 18 upon his return to Guatemala. On February 20, 2000, Mara 18 shot Elmer's younger brother Danny.

C.

On January 10, 2000, Petitioner was released from the INS children's facility in Texas into his brother Rubilio's custody. Petitioner traveled with his brother to Los Angeles where he lived. Petitioner testified that he left L.A. out of fear, because he saw people that "resembled" the Mara 18,[6] and moved to Virginia to stay with another family member.

On November 8, 2000, Petitioner admitted deportability at his deportation hearing, but requested relief in the form of asylum, withholding of removal, relief under the Convention Against Torture, or, in the alternative, voluntary departure. At his hearing on April 17, 2001, the IJ heard testimony from Petitioner and Jan Perlin, an expert qualified in the affairs of the Guatemalan justice system. The IJ also accepted numerous documents, including the aforementioned affidavits as well as other affidavits, copies of official documents, reports on Guatemala and those concerning Mara 18 itself.

Although the IJ held that Petitioner was credible, Oral Decision at 4-5 (J.A. 500-01),[7] and gave the documentary evidence "great

---

[6]Mara 18 was founded in Los Angeles and its members often sport a distinctive tattoo.

[7]The IJ found two exceptions to Petitioner's credibility, rejecting his contentions that: (1) Petitioner feared being harmed by Mara 18 because the gang believed he would take revenge for the killing of Edgar, and (2) Mara 18 would take revenge on Petitioner because the gang believed Petitioner would join a rival gang. Oral Decision at 4-5 (J.A. 500-01).

weight," *id.* at 3-4 (J.A. 499-500), he issued an oral decision declining to grant Petitioner relief. Based on the State Department's *Country Reports* and Perlin's testimony, the IJ found that the Guatemalan "justice system is dysfunctional" and that while the Guatemalan government "is willing to protect its citizens from these Mar[ ]a gangs . . . they are unable to protect the citizens." *Id.* at 9 (J.A. 505). However, the IJ found that Petitioner would not suffer persecution "on account of" his membership in a particular social group, namely his family, because "there is no nexus between the killing of [Edgar] and the threats to [Petitioner] or the threats to [Petitioner's] family, and that the [Petitioner's] family in this case does not constitute a particular social group." *Id.* at 11 (J.A. 507). In short, the IJ found that while Petitioner had a reasonably objective fear of harm from the gang, he determined that Petitioner was being recruited and harassed because he was a teenaged male living in the area, not on account of "any family reasons." *Id.*[8]

Additionally, the IJ found that Petitioner was not entitled to protection pursuant to the Convention Against Torture because the torture feared was not government sponsored. While the IJ acknowledged Mara 18's grip on the country and law enforcement's inability to control them, the IJ concluded that Convention Against Torture protection "does not extend to persons who fear entities that the government is unable to control." *Id.* at 13 (J.A. 510).

On appeal, the BIA affirmed. *In re Lopez-Soto*, No. A77-693-585, slip op. at 1 (BIA Feb. 20, 2003) (per curiam) (J.A. 517). The BIA held that, "respondent has failed to establish that the harm he fears is on account of a protected ground. We also agree that respondent has failed to establish eligibility for relief under the Convention Against Torture because he has not shown that the government acquiesces in the torturous activities of the gang, the Mara 18." *Id.* This petition for review followed.

---

[8]The IJ also held in the alternative that Petitioner could safely relocate within Guatemala, thus defeating his asylum claim. *See* Oral Decision at 13 (J.A. 509). The BIA did not reach the alternative holding because it affirmed the IJ's first holding. Since we deny the petition on the first ground, we, too, do not reach the alternative holding.

## II.

Our review of a BIA asylum eligibility determination is most narrow. *See Gonahasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999). Our standard of review recognizes the respect we must accord the BIA's expertise and its status as the Attorney General's designee in deportation decisions. *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992); *see also M.A. A26851062 v. INS*, 899 F.2d 304, 313-14 (4th Cir. 1990) (en banc). Specifically, BIA determinations concerning asylum eligibility are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks and citation omitted); *accord Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004). We have noted, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Gonahasa*, 181 F.3d at 541 (internal quotation marks and citations omitted). This standard is extremely deferential to the BIA's determinations; indeed, we will uphold the BIA determination unless a petitioner can "show that the evidence he presented was *so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.*" *Elias-Zacarias*, 502 U.S. at 483-84 (emphasis added); *accord Blanco de Belbruno*, 362 F.3d at 278; *Huaman-Cornelio*, 979 F.2d at 999. Finally, we review legal issues determined by the BIA de novo. *Blanco de Belbruno*, 362 F.3d at 278 (citing *Nwolise v. INS*, 4 F.3d 306, 309 (4th Cir. 1993)).

## III.

### A.

Petitioner argues that the BIA's ruling that he is not eligible for asylum is not supported by substantial evidence. The Immigration and Nationality Act authorizes the Attorney General to confer asylum on any "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is one "who is unable or unwilling to return to . . . [his or her native] country because of persecution or a well-founded fear of persecution *on account of* race, religion, nationality, *membership in a particular social group*, or political opinion." *Id.* § 1101(a)(42)(A) (emphasis added). In short, to qualify for asylum, one must show: (1) a well-founded fear of per-

secution; (2) on account of one of the above described enumerated statutory grounds; (3) by an organization that the government is unable or unwilling to control.[9] *See generally Elias Zacarias*, 502 U.S. at 481-83; *see also M.A. A26851062*, 858 F.2d at 218 (stating asylum is warranted if petitioner can show the "government is unwilling or unable to control the offending group") (citing *Lazo-Majano v. INS*, 813 F.2d 1432, 1434 (9th Cir. 1987)). Petitioner bears the burden of proof with respect to his eligibility for asylum. 8 C.F.R. § 208.13(a); *Ngarurih v. Ashcroft*, 371 F.3d 182, 187 (4th Cir. 2004). Regarding the level of proof required by a petitioner seeking asylum because of future persecution who, as here, has not demonstrated past persecution,[10] the statute is less clear than one might hope. The most reasonable reading of the statute, however, is that a petitioner must demonstrate fear of persecution based on a protected characteristic by a preponderance of the evidence. *See Zhu v. Ashcroft*, ___ F.3d ___, ___, 2004 WL 1854553, at n.6 (5th Cir. Aug. 19, 2004).

In this case, there is no dispute that Petitioner has a well-founded fear of persecution by an organization which the government is unable to control. The IJ found as much, and the BIA did not disturb his holding. Oral Decision at 12 (J.A. 508) ("[Lopez-Soto] has a subjective fear of persecution and based upon the evidence presented, there is an objective fear of harm by the Ma[ ]ra 18 gang to this respondent."); *see also Chen v. INS*, 195 F.3d 198, 203-05 (4th Cir. 1999) (discussing well-founded fear). Further, the IJ held that the Guatemalan government is "unable to protect the citizens from the Ma[ ]ra gangs," Oral Decision at 9 (J.A. 505), thus satisfying the third prong.

---

[9]Summarizing the case law on the last prong, the Seventh Circuit has recently noted that "there is no rule requiring that persecution actually be directed by the state or by an organized political party." *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2004) (citing 8 C.F.R. § 208.13(b)(3) and cases). *See also Roman v. INS*, 233 F.3d 1027, 1034 (7th Cir. 2000) (stating applicant need only show government condoned persecution or demonstrated an inability to protect victims); *Andriasian v. INS*, 180 F.3d 1033, 1042-43 (9th Cir. 1999) (holding threats by "thugs" could be the basis of persecution where government could not or would not control the threat).

[10]Indeed, Petitioner never raised a claim of past persecution before the IJ.

However, the IJ rejected Lopez-Soto's claim on the ground that there "is no nexus between the possible harm to this respondent and any of the grounds listed under the Act," *id.* at 12 (J.A. 508), and the BIA affirmed because Petitioner "failed to establish that the harm he fears is on account of a protected ground." BIA slip op. at 1 (J.A. at 517). Thus, the narrow question presented for review is whether the persecution at issue is "on account of" Petitioner's status as a member of a protected group. Accordingly, we turn to Petitioner's claim that the BIA's determination that he was not persecuted "on account of" his family membership is unsupported by substantial evidence.

## B.

### 1.

The BIA denied Lopez-Soto's asylum claim on the ground that he does not face persecution "on account of a protected ground." Slip op. at 1 (J.A. 517). As noted above, to establish a viable asylum claim, Petitioner must show his persecution was "on account of" his "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). To make such a showing, the applicant must (1) specify the particular social group, (2) show that he is a member of that group, and (3) show that he has a well-founded fear of persecution based on his membership in that group. *Id.*; *see generally Huaman-Cornelio*, 979 F.2d at 999. Petitioner argues that the BIA's conclusion was not supported by substantial evidence because he claims that there is evidence that he was persecuted on account of his membership in two particular social groups: his family and the young male members of his family.

We have never reached the issue of whether "family" constitutes a cognizable "particular social group" within the meaning of the statute. However, our sister circuits that have considered the issue all appear to have recognized that "family" so qualifies. *See Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997) (citing cases); *Fatin v. INS*, 12 F.3d 1233, 1239-40 (3d Cir. 1993) (accepting BIA's ruling in *Acosta*, *infra*, that "kinship ties" qualify as a particular social group); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common identifiable and immutable characteristics than that of the nuclear family."); *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986)

("Perhaps a prototypical example of a 'particular social group' would consist of the immediate members of a certain family, the family being a focus of fundamental affiliational concerns and common interests for most people."); *In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985) (describing membership in a particular social group and stating "[t]he shared characteristic might be an innate one such as sex, color or *kinship ties*") (emphasis added), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). We join our sister circuits in holding that "family" constitutes a "particular social group" under 8 U.S.C. § 1101(a)(42)(A).[11] Thus, we must turn to the question of causation and determine whether Petitioner's persecution was "on account of" such family membership.

2.

As detailed above, the IJ concluded that "there is no nexus between the killing of the respondent's brother and the threats to the respondent or the threats to the family," and the BIA affirmed, holding that Petitioner "has failed to establish that the harm he fears is on account of a protected ground." Instead, the IJ found that Petitioner was being recruited and threatened by Mara 18 because he was a 16-year-old male living in the area, and not because he was a member of a particular family. Petitioner, however, argues that the determinations of the IJ and the BIA ignored the applicable legal standard in reaching their conclusions. Lopez-Soto argues that the BIA examined his evidence and erroneously required him to show that Mara 18 was motivated *solely* by Petitioner's family membership, rather than merely showing that his persecution had *some* nexus to a protected ground. Thus, Petitioner argues that while part of Mara 18's motivations may have been that he was a young male living in Guatemala, the BIA erred in failing to recognize that his family membership was another causal aspect of his persecution.

---

[11]The IJ, as noted above, also found that Lopez-Soto's family did not constitute a particular social group. Oral Decision at 11 (J.A. 507). While we reject that conclusion, we recognize that the BIA did not specifically reach that aspect of the IJ's holding, but instead affirmed the IJ's conclusion that the persecution was not "on account of a protected ground." BIA slip op. at 1 (J.A. 517).

Petitioner is correct that to qualify for asylum, the persecution feared falls within the statute so long as the illicit motive was *a* cause —not necessarily the *sole* cause—of the persecution. *See Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir. 2003) ("A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds.") (citing *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997)); *Borja v. INS*, 175 F.3d 732, 735 (9th Cir. 1999) (en banc) (holding that proof of persecution "solely" on account of protected status is not required); *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994) (stating that "persecution on account of" does not mean "persecution *solely* on account of"); *see also Girma v. INS*, 283 F.3d 664, 667-68 (5th Cir. 2000) (per curiam) (following *Borja* and *Osorio* and applying a "mixed motive analysis"). However, the Immigration and Naturalization Act "makes motive critical," and the applicant "must provide *some* evidence of it, direct or circumstantial." *Elias-Zacarias*, 502 U.S. at 483. As noted above, the statute requires an applicant to prove such motivation by a preponderance of the evidence.

In support of his claim that Mara 18 was motivated in part by his familial membership, Appellant points to three pieces of evidence within the record: first, the testimony of an expert witness, credited by the IJ, who testified in an affidavit that "Mara 18 teaches that refusing to join . . . will result in their death or the deaths of their loved ones." J.A. 70 ¶ 5; second, the testimony of his brother Rubilio that every young member of his family has been targeted by Mara 18; lastly and relatedly, Petitioner's testimony that Mara 18 sent a letter to his family with an explicit reference to his brother Edgar.

Our determination of whether an illicit motive exists such that the persecution falls within the ambit of the statute presents a narrow factual inquiry. In this respect, our hands are tied by the great deference owed to the Attorney General's determination. In this case, while Petitioner presented expert testimony that Mara 18 targets family members of those who refuse to join, the expert further testified regarding Mara 18's reasons for doing so. He stated: "Mara 18 will target a family member of an individual who they have already killed for refusing to join the gang. This is because the gang fears that if it does not target that person, that person will seek revenge on Mara 18 by joining a rival gang." J.A. 70 ¶ 6. The IJ, however, found as a mat-

ter of fact that Mara 18 did not target Petitioner for such reasons, explicitly refuting that proposition. *Supra* note 7. Specifically, the IJ stated:

> There is no evidence that [Mara 18] believed that [Petitioner] would take revenge in 1999, nine years later. . . . And it is, as I've stated in my credibility finding, implausible that [Mara 18] would believe that he could take revenge on them, and revenge was not mentioned in any of the letters.
>
> There is no evidence that the respondent was going to join a rival gang and take revenge on the Ma[ ]ra 18 group. There is no evidence that the group believed he would join a rival gang. As I've stated, if they believed that, it is the opinion of the Court he would have been killed earlier.

Oral Decision at 10-11 (J.A. 506-07). Similarly, the IJ found that at least one of Mara 18's threats to Petitioner did refer to Edgar, but the IJ concluded that it did not demonstrate that Petitioner was recruited "on account of" Edgar, as opposed to the fact that Petitioner was a 16-year-old male living in the area whose brother happened to have been killed by the same gang. In fact, undisputed record evidence indicates that gang violence in Guatemala has reached pandemic proportions and that over 10,000 children are in gangs in Guatemala and that "young males" are a target of gang violence. Indeed, Petitioner's expert witnesses gave affidavit testimony stating that Guatemalan gang violence is an "epidemic" and that boys and young men "often face torture or murder if they do not join." *See* J.A. 59-62, 69-70.

Moreover, in examining the motivation of Mara 18, the record reflects that the gang did not threaten Petitioner concerning his brother's death until, at the earliest, September 1999, when Petitioner's parents received a letter from the gang instructing Petitioner to meet the gang on November 15, 1999 at Rio de Paz, the place where the gang killed his brother. *See id.* 18, 415-16. This letter arrived after Petitioner had left for Puerto Barrios and at least eight months after the gang's initial contact with Petitioner in the park in January 1999. During this eight month period, from the initial incident to the last letter, Petitioner testified that the gang continuously threatened him:

> They said that if I didn't join them, that they were going to kill me. They said that I would have everything with them, money, drugs, everything. I never listened. I never paid attention to them. But by seeing that they were threatening - - threatening me by death and that I couldn't leave, I - - we decided that I had to leave the country.

*Id.* at 414. However, none of these repeated threats ever mentioned Petitioner's brother until after Petitioner had fled his home. *Id.* If the gang was motivated even in part by Petitioner's familial relationship, the evidence in the record should show that at some point during these continuous threats the gang threatened him *because of* his relationship with his brother.[12]

On these bases, we are not compelled to conclude that the IJ's determination that Petitioner failed to prove his case by a preponderance of the evidence is one a reasonable judge could not make. On this record there is no evidence so compelling that *no* reasonable factfinder could fail to find *causation*. Specifically, the only piece of evidence Petitioner presents regarding causation is his brother's affidavit, stating:

> *Because of* my family's continued opposition to Mara 18, gang members have targeted young male members of my family for recruitment. I believe that Mara 18 is particularly attracted to young male members of my family *because of* our demonstrated resistance to joining. *Because of* our continued resistance, Mara 18 has threatened and attempted to kill off the young male members of my family.

---

[12]The IJ's factual finding that Mara 18 threatened Petitioner concerning his brother's death in the January 1999 park incident, *supra* I.A., is favorable to Petitioner, but contradicted by Petitioner's own testimony. A determination of ineligibility for asylum or withholding is upheld if supported by substantial evidence on the record considered *as a whole*. *Elias-Zacarias*, 502 U.S. at 481. Viewing the record as whole, it does not establish that Mara 18 threatened Petitioner with his brother's death until, at the earliest, September 1999 thus significantly undermining Petitioner's argument that he was targeted "on account of" his family membership.

J.A. 45-46 ¶ 5 (emphasis added). Besides that affidavit, Petitioner largely presents evidence of correlation. In finding that Petitioner's evidence would not *compel* a reasonable fact finder to conclude that he was persecuted "on account of" his family membership, we recognize that a reference to an event does not demonstrate that what follows is "because of" that event. To illustrate: stating that Petitioner would be killed "like Edgar" is not necessarily the same as declaring he would be killed "because" Edgar was killed. Rather, the reference to Edgar — as the IJ found — could be observation, not a statement germane to causation.

For Mara 18 to threaten Petitioner in the letter by reminding him of Edgar's death is admittedly vicious and terrifying. However, the IJ and the BIA reached the factual conclusion that, in this context, such a comment was essentially a normative, anecdotal statement that put Petitioner on notice that Mara 18 knew his brother was Edgar, whom they killed nine years earlier. In that regard, the statement is materially different than one compelling a finding of causation, *e.g.*, "because your brother did not join our gang nine years ago, we will kill you." *Compare Gonzales-Neyra v. INS*, 122 F.3d 1293, 1296 (9th Cir. 1997) (reversing a BIA determination and holding applicant was persecuted "on account of" his political opinion where threats to his life and business "were made after the guerillas learned of his political orientation"), *and Gebremichael*, 10 F.3d at 36 (finding persecution "on account of" family membership where Ethiopian security forces persecuted applicant in an effort to force him to reveal his brother's whereabouts).

Thus, under our limited and deferential standard of review, we cannot say that it is unreasonable to find as did the BIA on these facts. We take pains to make our reasoning as clear as possible: we do not find that evidence like the Petitioner's *could not* support a determination by the IJ and the BIA that Lopez-Soto was targeted on account of his family status among other variables. Rather, we hold only that the evidence does not *compel* such a conclusion. For, of course, if an applicant "seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable factfinder" could find otherwise. *Elias-Zacarias*, 502 U.S. at 483-84.[13] Stated otherwise, we do not conclude that the

---

[13]*Cf. Lukwago*, 329 F.3d at 171-72 (rejecting the notion that finding of causation was compelled in light of record revealing that rebel force "in-

BIA's determination, that Mara 18's desire to harm Petitioner was not on account of his relationship to Edgar, is unsupported by substantial evidence.[14]

---

discriminately persecute[d] civilians"); *Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003) (stating "[s]ince we have a very deferential standard of review of the BIA's findings of fact and may only reverse these findings if the evidence compels us to do so [citation], we must affirm the BIA's conclusion that [applicant] was not persecuted on account of his religion, but rather because of retaliation in response to a personal dispute involving his father."); *Jahed v. INS*, 356 F.3d 991, 1003 (9th Cir. 2004) (Kozinski, J., dissenting) ("Whether persecution is 'on account of' a petitioner's political opinion is a question of fact; it turns on evidence about the persecutor's motives. Here, the IJ found that '[t]he actions of the soldier appeared motivated by his isolated desire for money, not by the applicant's political opinion.' . . . The record amply supports the IJ's findings.").

At oral argument, Petitioner repeatedly proffered that *Del Carmen Molina v. INS*, 170 F.3d 1247 (9th Cir. 1999), supported his argument that he was persecuted on account of his family membership. In *Del Carmen Molina*, guerillas in El Salvador targeted an applicant's cousins because they had served in the military. The guerillas wrote notes to the applicant, telling her that they wanted to speak with her about her cousins and if she did not comply they would retaliate. *Id.* at 1249. The Ninth Circuit reversed the IJ's conclusion that these efforts to contact the applicant did not amount to past persecution and held the notes were akin to death threats. *Id. Del Carmen Molina*, however, primarily concerns the "persecution" prong of the Immigration and Naturalization Act, not the prong at issue here, *i.e.*, whether persecution occurred "on account of" group membership. For in *Del Carmen Molina*, the court held that the applicant offered uncontradicted, credible testimony that she had been threatened "on account of" her political opinion. *Id.* at 1250.

[14]Lopez-Soto sought withholding of removal as an alternative to asylum. It is well settled that eligibility for withholding of removal is subject to a more demanding standard than that for asylum. *See, e.g.*, *Ngarurih*, 371 F.3d at 189 n.7. Because Petitioner fails to satisfy the lesser standard, he clearly cannot demonstrate eligibility for withholding of removal.

IV.

Petitioner further argues that he is entitled to withholding of removal and protection pursuant to Article 3 of the United Nations Convention Against Torture (the "Convention" or "CAT"). *See* United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85. Under the Convention, the United States will not "expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681 (1998) (codified as note to 8 U.S.C. § 1231); *see Elien v. Ashcroft*, 364 F.3d 392, 398 (1st Cir. 2004) (discussing implementation of the Convention); *Khouzam v. Ashcroft*, 361 F.3d 161, 162-63, 166-71 (2d Cir. 2004) (discussing the Convention with exhaustive detail). The Convention was made judicially enforceable through 8 C.F.R. §§ 208.16(c), 208.18(b)(2). *Pelinkovic v. Ashcroft*, 366 F.3d 532, 535 (7th Cir. 2004).

As we have recently noted in *Camara v. Ashcroft*, ___ F.3d ___, 2004 WL 1753535 (4th Cir. Aug. 6, 2004), Convention claims are analytically distinct from asylum claims and judged under a different standard. In this case, to be entitled to relief under the Convention, Petitioner must establish that "it is more likely than not" that he would be tortured[15] if returned to Guatemala, 8 C.F.R. § 208.16(c)(2), and such torture "is inflicted by or at the instigation of *or with the consent or acquiescence* of a public official or other person acting in an official capacity," *id.* § 208.18(a)(1) (emphasis added).

Here, neither the IJ nor the BIA disputed that it was more likely

---

[15]The Convention regulations define "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind." 8 C.F.R. § 208.18(a)(1).

than not that Lopez-Soto would be tortured if removed. Rather, the BIA concluded that Petitioner "failed to establish eligibility for relief under the Convention Against Torture because he has not shown that the government acquiesces in the torturous activities of the gang, the Mara 18." BIA slip op. at 1 (J.A. 517); *see also* Oral Decision at 13-14 (J.A. 509-10) (IJ's holding that Lopez-Soto was not eligible). The only question, then, is whether the conclusion that the government does not acquiesce in such torturous activities is supported by substantial evidence.

Petitioner argues that the BIA and IJ committed legal error in focusing exclusively on the national government's acquiescence — rather than that of local authorities — which requires, at minimum, a remand to the BIA for it to determine whether local government officials acquiesced in the torturous activities of Mara 18. *See* Br. for Pet. at 32; *see also Zheng*, 332 F.3d at 1191-92 (discussing acquiescence of local Chinese officials in smuggler's torturous acts); *Ali v. Reno*, 237 F.3d 591, 598 (6th Cir. 2001) (finding no acquiescence based on actions of the local level of a national police force). The government argues that Petitioner is barred from raising the argument regarding acquiescence of local government because he failed to raise it before the IJ or BIA. Br. for Gov't at 25. The government's argument is misplaced; the record demonstrates that Petitioner has continuously advanced his CAT claims with reference to local as well as national authorities. *See* J.A. 6; Supp'l App. 18, 32. Despite this, even accepting *arguendo* Petitioner's argument that the IJ and the BIA committed a legal error by not analyzing acquiescence of local government officials, we find that the BIA's holding that the government does not "acquiesce" in Mara 18's activities is supported by substantial evidence.

"Acquiescence" as used in 8 C.F.R. § 208.18 does not require "knowing acquiescence" in or "willful acceptance" of such torture. *See Zheng*, 332 F.3d at 1194. Rather, "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture have *awareness* of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7) (emphasis added); *accord Zheng, supra*. To qualify for relief under the Convention, Petitioner must "prove that the torture inflicted by [Mara 18] would be carried out with the awareness of the

[local] government officials. That awareness includes 'both actual knowledge and "willful blindness."'" *Zheng*, 332 F.3d at 1194 (citations omitted); *see also Khouzam*, 361 F.3d at 170 (following *Zheng* and applying willful blindness standard); *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354 (5th Cir. 2003) ("'Willful blindness' suffices to prove 'acquiescence.'") (citation omitted). Here, Petitioner made no such showing.

While the BIA affirmed the IJ, who acknowledged that the Guatemalan government is powerless to stop Mara 18 and has a dysfunctional justice system, *supra* at 6, the record nonetheless lacks evidence in support of local "acquiescence." Rather, the IJ found — as is clear from Petitioner's testimony — that other than reporting the death of Edgar to authorities,[16] Petitioner's family did not seek help of the police or other authorities. *See* Oral Decision at 7 (J.A. 503) ("[Petitioner] did not go to the police with that letter because he believed that it would do no good to go to the police and feared that there might be retaliation on his family if he went to the police."). While the record may show that, in the abstract, government officials know of Mara 18's activities, and are generally unable to stop them, it does not show — as Petitioner must — that local government officials demonstrate "willful blindness" to the torture of their citizens by third parties. *Zheng*, 332 F.3d at 1196. Here, Lopez-Soto failed to make the appropriate showing that the local officials were aware of, let alone willfully blind to, the harassment suffered by Petitioner, his cousin Elmer, or other family members.[17] Accordingly, we deny Lopez-Soto's petition for review of his CAT claim.

---

[16]The transcript of the IJ's oral ruling states "the father didn't report to the police the names of individuals he believed were involved in the killing of his son, and that the perpetrators were not caught." *In re Lopez-Soto*, No. A 77 693 585 (Apr. 19, 2001), Oral Decision at 6 (J.A. 502). The transcript seemingly contains a typographical error, however. *See* Br. for Pet. at 36 n.11 (arguing the IJ's oral decision contains a typographical error). The record contains a notarized police report filed by the father, *see* J.A. 89-94, and nowhere did the IJ state that he did not accept the validity of the report.

[17]For example, while Petitioner did testify that his brother's killers "were never even caught or punished" and that his father "tried to prosecute the murderers," he also noted that "the two assassins ran away after the murder." J.A. 15. Thus, the testimony is not that the government was willfully blind or otherwise acquiescent in the violence. Rather, the evidence reveals that the murders escaped.

## V.

For the reasons stated above, we conclude that the BIA did not err in denying Lopez-Soto's claims for asylum relief or protection under the Convention. Accordingly, we deny Lopez-Soto's petition for review.

*PETITION DENIED*

MICHAEL, Circuit Judge, dissenting:

Rutilio Lopez-Soto should be granted asylum in the United States. He is the youngest of three brothers, all of whom have been threatened with death by the Mara 18 street gang in Guatemala. One brother died after being stabbed eighteen times by Mara 18, and the other fled to the United States as a result of the gang's threats. Rutilio fled Guatemala with his cousin Elmer Lopez Mejia after they, too, were threatened by Mara 18. Elmer did not make it to the United States; he was caught in Mexico and returned to Guatemala, where he was promptly shot and killed by the gang. Elmer's brother Danny was also shot by Mara 18 just a few months after Elmer was killed. The immigration judge (who was affirmed summarily by the BIA) found all of these facts, but he denied Rutilio asylum after concluding that he was not persecuted "on account of" his family membership. The IJ also denied asylum for the alternative reason that Rutilio could safely relocate within Guatemala, even though Mara 18 was hounding him as he fled. The majority affirms the IJ's denial of asylum on the ground that Mara 18 did not persecute Rutilio on account of his family membership. I respectfully dissent because any reasonable fact-finder would have to conclude the opposite.

## I.

The following facts, many of which come from Rutilio Lopez-Soto's testimony and affidavit, are undisputed. Mara 18 began targeting the Lopez-Soto family in 1990, when Rutilio, the asylum applicant, was eight years old. The gang approached Rutilio's twenty-two-year-old brother Edgar, who had just been discharged from the Guatemalan army. As the immigration judge found, Edgar's military

training made him an attractive candidate for recruitment by the gang. Edgar knew he would endanger himself by resisting the gang, but he was "very religious" and for this reason "would never join a gang." J.A. 46. When Edgar was attending a party in the town of Rio de Paz on April 15, 1990, two Mara 18 members killed him by stabbing him eighteen times; the killers were reported to the police, who did nothing. After Edgar's death the gang targeted Rubilio, Rutilio's twenty-year-old brother, also an army veteran. The gang warned Rubilio that if he did not join, he, too, would be killed. After consulting with his parents, Rubilio decided that it would be safer for his family and for him if he left Guatemala. Rubilio fled to the United States in 1990, the same year Edgar was killed.

Mara 18 targeted Rutilio in early 1999, after he turned sixteen. Rutilio and his cousin Elmer Lopez Mejia were in a park (in their home town of Quesada) when they were approached by a large group of Mara 18 members. The boys were told that if they did not join the gang, they would be killed. Mara 18 has a practice of targeting family members of persons it has killed for refusing to join "because the gang fears that if it does not target [the family members], [they] will seek revenge on Mara 18 by joining a rival gang." J.A. 70. (Joining a rival gang, however, does not ensure safety. Mara 18 kills rival gang members, too, and if the victim bears the rival gang's tattoo, Mara 18 "will cut the flesh bearing the tattoo from the victim's body and leave it in a place where members of that rival gang will find it." J.A. 76.) In the summer of 1999, Rutilio and Elmer received threatening letters from Mara 18 at their homes. The boys fled in September to Puerto Barrios, a town seven hours away from Quesada, their hometown. In Puerto Barrios they stayed with a friend of Rutilio's father while they prepared to leave Guatemala. During the time (roughly a month) that Rutilio and Elmer were in Puerto Barrios, Rutilio's family continued to receive threatening letters from Mara 18. The last two letters warned Rutilio that if he did not join the gang, he would be stabbed eighteen times just as his brother Edgar was. Mara 18 pressed Rutilio for an answer, and the last letter instructed him to meet the gang on November 15 in Rio de Paz, the place where Edgar was murdered. The gang added that it knew Rutilio intended to flee the country and warned that any such effort would be futile. This last letter prompted Rutilio's father to call Rutilio and tell him that he "must flee Guatemala immediately." J.A. 19. Rutilio, like his father, feared that if he

did not "show [his] allegiance to the gang" by meeting it in Rio de Paz, Mara 18 would find him and murder him. J.A. 18-19. After Mara 18 targeted Rutilio, he twice applied for a visa at the United States embassy in Guatemala, but he was denied the document each time.

In November 1999 Rutilio and Elmer left Guatemala and traveled north through Mexico, by bus and by hitchhiking, in an effort to reach the United States. Rutilio took only clothing, food, money, and a map. Whenever the boys ran out of money, they would work on a construction job for a day or so, until they made enough to resume their travel. As they journeyed northward, the boys tried to avoid Mexican immigration checkpoints; however, at a bus stop in Oaxaca, immigration officers spotted the boys and released dogs in an effort to catch them. The two started running, but Elmer fell down, was caught, and deported to Guatemala. Within days of his return, Elmer was shot in the head by Mara 18. (Three months later Elmer's younger brother, Samuel (Danny) Lopez Mejia, was shot five times by Mara 18. Danny recovered from his wounds and was able to flee Guatemala.) In the meantime, Rutilio managed to evade the Mexican authorities in Oaxaca, and he resumed his journey toward the United States. He arrived at the Texas border on December 22, 1999, with only his map, and he was detained by the INS. Rutilio contacted his family from the INS detention center in January 2000 and learned of Elmer's death. A short time later he learned about the shooting of his other cousin, Danny. At the hearing in his removal proceeding, Rutilio was asked what would happen if he was returned to Guatemala. He replied, "I would only arrive to receive my death." J.A. 425.

The immigration judge found Rutilio's testimony "credible with two exceptions." J.A. 500. The IJ rejected only Rutilio's opinions that "the [Maras] feared that [he] would take revenge [on them] because of the killing of his brother, and also that [the Maras] would take revenge [on Rutilio] because they feared he would join a rival gang." J.A. 500. The IJ explained that Rutilio "is a religious person and against violence," and therefore "it would be implausible that [the Maras] would impute to him the belief that he would take revenge on them." J.A. 500-01. The IJ added that if the gang had believed Rutilio might take revenge on it for killing his brother, "he would have been killed earlier." J.A. 507. The IJ further concluded that Mara 18 did not fear that Rutilio would join a rival gang. According to the IJ, no evi-

dence suggested that Mara 18 believed Rutilio would join a rival gang, and Rutilio's religious beliefs made it unlikely he would join such a gang. Because the IJ reasoned that Mara 18 was not likely to believe either that Rutilio would avenge his brother's death or that he would join a rival gang, the IJ concluded that Rutilio was *not* targeted on account of his family. Rather, the IJ determined that Rutilio "was being recruited because he was 16 years-old and a male in that area, and not because of any family reasons." J.A. 507. The IJ therefore denied the application for asylum. In the alternative, the IJ denied the application on the ground that Rutilio "could have relocated to other areas of Guatemala." J.A. 509. Rutilio could relocate, the IJ found, because he "drove seven hours away [from home] to Puerto Barrios, where he worked briefly, stayed there for one month and had no problem with the [Maras]." *Id.* The majority affirms based on the IJ's first determination, so it does not reach the alternative ground.

## II.

To be eligible for asylum as a refugee, Rutilio Lopez-Soto must show (1) that he has a well-founded fear of persecution "on account of" his "membership in a particular social group," in this case, his family and (2) that he cannot reasonably relocate elsewhere in Guatemala. 8 U.S.C. §§ 1158(b)(1), 1101(a)(42) (2003)); *Cruz-Diaz v. INS*, 86 F.3d 330, 331 (4th Cir. 1996).

## A.

No one disputes that Rutilio has a well-founded fear of persecution; the critical issue is whether his fear is *on account of* his family membership. As the majority correctly points out, for an asylum applicant to fear persecution "on account of" his family membership, the persecution need not stem *solely* from family membership. Rather, the applicant "falls within the statute so long as the illicit motive [his family membership] was *a* cause — not necessarily the *sole* cause — of the persecution." *Ante* at 11 (emphasis in original). *See also Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir. 2003) (explaining that persecutor "may have multiple motivations" as long as one of those motivations is "one of the enumerated grounds"); *Borja v. INS*, 175 F.3d 732, 735 (9th Cir. 1999) (en banc) (holding that persecution "on account of" does not mean "*solely* on account of) (emphasis in origi-

nal). The burden of establishing the persecutor's motive is straightforward: the applicant must simply "provide *some* evidence of [illicit motive], direct or circumstantial." *Ante* at 11 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis in original). At the hearing the applicant must prove his persecutor's motive by a preponderance of the evidence, the majority holds. *Id.* Of course, the "testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (2004).

We owe substantial deference to an immigration judge's factual determinations; we treat them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). *See also Elias-Zacarias*, 502 U.S. at 483-84 (BIA's determination that applicant is not eligible for asylum can be reversed only if the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution"). Nevertheless, when the IJ's "findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record," they are not sustainable on review. *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (en banc). Further, when an IJ rejects an applicant's testimony as unworthy of belief, he must provide "specific, cogent reasons" for doing so; and in reviewing the IJ's credibility determinations, we must "examine the record to see whether substantial evidence supports [the determinations] and [decide for ourselves] whether the reasoning employed by the IJ is fatally flawed." *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). The IJ's legal determinations are reviewed de novo. *Tarvand v. INS*, 937 F.2d 973, 975 (4th Cir. 1991). The IJ's decision to deny Rutilio asylum cannot be sustained under these standards. First, in concluding that Mara 18 did not persecute Rutilio because of his family membership, the IJ made a series of faulty inferences stemming from his finding that Rutilio's family is religious. *See Del Valle v. INS*, 776 F.2d 1407, 1413 (9th Cir. 1985) (conclusions reached through unreasonable inferences are not supportable). Second, the IJ failed to apply the principle that persecutors may have multiple motives so long as a statutory motive (here, family membership) played some part in the persecution. When this principle is applied to the evidence, it compels the conclusion that Rutilio's persecution was on account of his family membership.

B.

Mara 18 targets family members of those who resisted recruitment (and were killed as a result) because the gang fears that the surviving family members will either seek revenge on Mara 18 directly or join a rival gang. After finding that Rutilio was not likely to take either course, the IJ inferred that Mara 18 did not view Rutilio as a threat. Both Rutilio and his brother, Rubilio, testified that their opposition to Mara 18 stemmed from their religious faith. Also, when Rutilio's father was approached by Edgar's army friends who offered to avenge Edgar's death, the father said he did not "want[ ] to take vengeance," but would "leave it up to the Good Lord." J.A. 409. Based on this and other evidence, the IJ found that "[Rutilio] and [his] entire family are practicing Evangelical Christians who are opposed to criminal activity and opposed to organizations that violate the law" and that Rutilio was not likely to avenge his brother's death or join a rival gang. J.A. 501. This finding led the ALJ to infer that "it would be implausible that [the Maras] would" harbor "the belief that [Rutilio] would take revenge on them personally." J.A. 501. After inferring that the Maras would not view Rutilio as a threat, the IJ then concluded that Rutilio was not persecuted on account of his relationship to his brother.

The IJ's chain of reasoning is supported by speculation and faulty inference, not by substantial evidence. There is no evidence that the Mara 18 *knew* that Rutilio was religious or that he was unlikely to seek revenge or join a rival gang. *See Del Valle*, 776 F.2d at 1413 (conclusions must be based on substantial evidence, not conjecture). As a result, there was no basis for the IJ to suppose that the gang would have treated Rutilio any differently than the family members of others it failed to recruit and then killed. Even had Mara 18 both *known* of Rutilio's religious beliefs and *believed* that he was unlikely to pose a threat, it still does not follow that Rutilio was not persecuted on account of family membership. Indeed, it was consistent with the gang's regular practice for it to target Rutilio in retaliation for his brother's refusal to join. Moreover, Rutilio's *opinions* on why he and his family members were targeted are superfluous. The IJ was free to reject those opinions, but they cannot be used to defeat Rutilio's basic claim of persecution. At bottom, Rutilio is only required to provide *some* evidence that the gang did in fact target him partly because of his family. Rutilio has done this by showing a pattern of Mara 18

retaliation against him and his family members as a result of his brother Edgar's refusal to join the gang.

The IJ also speculated that if Mara 18 actually "believed [Rutilio] would join a rival gang," then "he would have been killed earlier." J.A. 507. This statement has no support in the record and ignores Mara 18's interest in filling its ranks in addition to eliminating its enemies. Rutilio was only eight years old when his older brother was stabbed, and an eight-year-old boy was no threat to the gang. When Rutilio reached his mid teens — old enough to pose a threat — the gang forced him to show his allegiance or face death. In short, the record makes clear that Mara 18 knew that Rutilio was the brother of Edgar, whom the gang murdered, and the gang threatened Rutilio with reminders of his brother's brutal murder. The inquiry into whether Rutilio was persecuted on account of family membership should begin with these facts.

Moreover, the inquiry must proceed on the premise that family membership need only play a *partial* role in Mara 18's motivation. The evidence about Mara 18's general methods combined with its actions against Rutilio and his family compel the conclusion on review that Mara 18 persecuted Rutilio at least partly "on account of" family membership. Rutilio's brother, Rubilio, stated in his affidavit that "[b]ecause of my family's continued opposition to Mara 18, gang members have targeted young male members of my family for recruitment. I believe that Mara 18 is particularly attracted to young male members of my family because of our demonstrated resistance to joining." J.A. 45. Other evidence establishes that "Mara 18 teaches [its targets and young members] that refusing to join and leaving the gang will result in their death or the deaths of their loved ones." J.A. 70. Indeed, after Edgar, the original target in the Lopez-Soto family, refused to join the gang and was killed, both of his brothers were persecuted. The gang, even nine years later, recalled Edgar's death and told Rutilio in at least two threatening letters that if he did not join, he would meet the same fate as his murdered brother. Mara 18 focuses its general recruiting on young males "who demonstrate strength and courage," especially those with military training. J.A. 76. Rutilio, of course, had no military training, which indicates that he was targeted because of his relationship to his brother Edgar. And after Rutilio's cousin and companion in flight, Elmer, was returned by

the Mexican authorities to Guatemala, Mara 18 promptly murdered Elmer and shot Elmer's brother Danny. The threats against Rutilio, with repeated references to Edgar, and the attacks against other family members, are undisputed. These actions demonstrate that Mara 18 remembers those who refuse to join with it and retaliates against them *and* their family members. A reasonable factfinder would have to conclude that Mara 18 was motivated at least partly on account of family membership in carrying out this systematic persecution.

C.

The majority dismisses the pattern of persecution against Rutilio and his family as a mere "correlation" of events. *Ante* at 14. Explaining that "a reference to an event does not demonstrate that what follows is 'because of' that event," the majority asserts that threats that Rutilio would be killed "like Edgar" are "not necessarily the same as declaring he would be killed 'because' Edgar was killed;" in other words, Mara 18's references to Edgar "could be observation[s], not [ ] statement[s] germane to causation." *Id.* Though any reasonable target of the statement, "join us or be killed like your brother Edgar," would understand it as a threat based on a family connection, the majority treats it as "essentially a normative, anecdotal statement that put [Rutilio] on notice that Mara 18 knew his brother was Edgar, whom they killed nine years earlier." *Id.* The majority explains that had Mara 18 told Rutilio, "'because your brother did not join our gang nine years ago, we will kill you,'" it would have "compel[led] a finding of causation." *Id.* Thus, the majority concludes, Rutilio "largely presents evidence of correlation" rather than evidence of causation or motive. I respectfully disagree.

In *Elias-Zacarias* the Supreme Court acknowledged that an applicant for asylum "cannot be expected to provide direct proof of [causation, that is,] his persecutors' motives." 502 U.S. at 483. For this reason, "[a]n applicant for asylum need not show conclusively why persecution occurred in the past or is likely to occur in the future . . . [but] must produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground." *Borja*, 175 F.3d at 736 (internal citation and quotation marks omitted). *See also In re S-P-*, 21 I & N Dec. 486, 495 (1996) ("The task of the alien is to demonstrate the reasonableness of

a motivation which is related to one of the enumerated grounds.") (internal quotation marks omitted). Indeed, "[i]n some cases, the *factual circumstances alone* may provide sufficient reason to conclude that acts of persecution were committed on account of . . . one of the [ ] protected grounds." *Ernesto Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) (emphasis added). Rutilio presented factual circumstances sufficient to prove that he was persecuted on account of his family membership. As the IJ *found*, after Edgar refused to join Mara 18, the gang targeted family members Rubilio, Rutilio, Elmer, and Danny over a span of nine years, sent letters to Rutilio's home that ordered him to meet the gang at the place where Edgar was murdered, and gave Rutilio the choice of joining the gang or being killed like Edgar.

The majority tries to downplay Mara 18's threats to Rutilio that emphasized the death of his brother Edgar because those threats did not come until "eight months after the gang's initial contact with [Rutilio] in the park in January 1999." *Ante* at 12. According to the majority, "[i]f the gang was motivated even in part by [Rutilio's] familial relationship, the evidence in the record should show" a threat that mentioned Edgar at some earlier point. *Ante* at 13. This argument overlooks the five-month hiatus between the first threat and the final series of threats; it also overlooks the context of the threats referring to Edgar and the expert evidence about Mara 18's routine practice. After Mara 18 first threatened Rutilio in early 1999, he managed to avoid the gang for about five months by hiding in his home. Mara 18 renewed its effort to contact Rutilio when it sent a threatening letter to his home in July 1999 and again in August. The very next month, September, the gang sent Rutilio two letters warning that he must join the gang or be stabbed eighteen times just like his brother Edgar. The last letter contained Mara 18's final ultimatum to Rutilio: meet us on November 15 in Rio de Paz (the place where Edgar was killed) and join our gang, or be killed like your brother. Mara 18 thus telegraphed a motive — that Rutilio was being targeted because of family membership — as soon as it decided to bring matters to a head. This motive is corroborated by the undisputed affidavit of an expert witness who confirms that Mara 18 targets the family members of those it murders for refusing to join the gang. J.A. 70.

In summary, Rutilio offered ample evidence to prove at the hearing that he was persecuted on account of his family membership, and this

evidence is sufficiently compelling on review to reverse the IJ's ultimate finding to the contrary.

### III.

The immigration judge also denied asylum to Rutilio on the alternative ground that he could safely relocate within Guatemala. For asylum to be denied on this basis, the evidence must establish that it would be reasonable, under all the circumstances, for the applicant to relocate. 8 C.F.R. § 208.13(b)(2)(ii); *Melkonian v. Ashcroft*, 320 F.3d 1061, 1069-71 (9th Cir. 2003). Whether internal relocation is reasonable is determined by "considering whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health and social and family ties." *Knezevic v. Ashcroft*, 367 F.3d 1206, 1214 (9th Cir. 2004). *See also* 8 C.F.R. § 208.13(b)(3). The regulations further provide that there is a presumption against an applicant's ability to safely relocate once he demonstrates (as Rutilio has here) that he suffered past persecution. 8 C.F.R. § 208.13(b)(1)(i)(B); *see Singh*, 63 F.3d at 1510-11. There is no need for an applicant to show countrywide persecution; rather, "the only relevant question is whether conditions in the country have so *changed* that the threat no longer exists upon his return." *Singh*, 63 F.3d at 1510 (emphasis in original). *See also Chanchavac v. INS*, 207 F.3d 584, 592 (9th Cir. 2000).

The IJ observed that "the background information does indicate that the [Maras] operate throughout the country of Guatemala, and as I have stated in my findings, the government of Guatemala is unable to control them;" nevertheless, the IJ concluded that Rutilio could safely relocate within Guatemala. J.A. 509. The IJ failed to acknowledge the presumption against safe relocation when there is past persecution, nor did he consider any of the relevant factors for assessing whether relocation would be reasonable. Rather, the IJ's conclusion that Rutilio could safely relocate was based solely on the finding that Rutilio "drove seven hours away to Puerto Barrios, where he worked briefly, stayed there for one month and had no problem." J.A. 509.

The proper legal analysis begins with the presumption that Rutilio cannot safely relocate. The fact that he spent a single month (largely

in hiding) in a town seven hours away from his home before fleeing Guatemala does not overcome this presumption. Nor do other findings by the IJ rebut the presumption against safe relocation. The IJ did not find changed conditions in Guatemala; to the contrary, he found that Mara 18 operates countrywide and cannot be controlled.

Moreover, the IJ's finding that Rutilio "had no problem" with the gang the one month he was in Puerto Barrios is not supported by substantial evidence. During that brief time the gang continued to send letters to his home, threatening that he would be killed if he did not meet the Maras in Rio de Paz and warning that he would be killed if he tried to flee the country. Other evidence establishes that a young man who rejects membership in Mara 18 will be "relentlessly pursued . . . as long as he remains in Guatemala." J.A. 62. The IJ's determination that Rutilio could relocate is thoroughly flawed: it fails to take into account the required factors; it fails to give Rutilio the benefit of the presumption against safe relocation; and the essential factual finding supporting the determination is not supported by substantial evidence. I would therefore vacate the IJ's determination that it would be reasonable for Rutilio to relocate within Guatemala. Relocation is not a lifesaving option.

## IV.

Mara 18 gang members have threatened Rutilio Lopez-Soto with death, persecuted two of his older brothers and two of his cousins, and told him that he will meet the same fate as his murdered older brother if he does not join their ranks. There is extensive evidence concerning Mara 18's persecution of the Lopez-Soto family and the gang's nationwide activities in Guatemala. This compels the conclusion on review that Rutilio was persecuted at least partly on account of his family and that he cannot safely relocate within Guatemala. I would therefore grant the petition for review, vacate the IJ's decision, and remand the case.