In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1532

YI-TU LIAN,

*Petitioner*,

*v.*

JOHN D. ASHCROFT,

*Respondent.*

———————

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A78 859 704.

———————

ARGUED JUNE 15, 2004—DECIDED AUGUST 12, 2004

———————

Before POSNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. Lian, a Chinese citizen, asks us to set aside an order issued by an immigration judge and affirmed without opinion by the Board of Immigration Appeals removing him to China. He claims that sending him back to China would violate Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85 (1984). Adopted as federal law by section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1988, 8 U.S.C. § 1231,

Article 3 forbids expelling a person to "a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." An implementing regulation defines "substantial grounds for believing the person would be in danger of being subjected to torture" to mean that he "is more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(4); see *Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004); Deborah E. Anker, *Law of Asylum in the United States* 510-11 (3d ed. 1999). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person," by or with the acquiescence of an official, for various purposes, including punishment. 8 C.F.R. § 208.18(a)(1); see, e.g., *Pelinkovic v. Ashcroft*, 366 F.3d 532, 541 (7th Cir. 2004).

Lian applied for and received a Chinese passport in 2001. His intention in doing so was to emigrate, for reasons unnecessary to consider. He paid "snakeheads," as they are called, thousands of dollars (given him by his father) to smuggle him into the United States. After a roundabout sequence of flights arranged by the snakeheads, Lian arrived at O'Hare Airport in February of 2002, minus his passport, which he claims the snakeheads had taken from him. He was promptly arrested, lacking as he did valid travel documents, and ordered returned to China.

At first glance it is difficult to see how he can anticipate any untoward consequences from returning to China. He had, after all, a valid passport, which allowed him to travel outside the country. He no longer has a passport, but it is common enough for travelers to lose their passports, and China doubtless has a record of having issued it to him. However, it turns out that China may well discover (indeed, may have discovered already) that Lian is to be forcibly returned to China because he entered the United States

illegally. No country can be forced to accept a deported alien, so whenever the U.S. government wants to deport ("remove," it is now called) someone, a travel document must be obtained from the alien's embassy or consulate that will allow him to reenter his country. 6 Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, *Immigration Law and Procedure* § 72.08[2][b][ii] (2004).

Well, so what? The "so what" is that it is illegal for a Chinese citizen to emigrate without the permission of the Chinese government, *British Home Office Report on Asylum in the UK, China Extended Bulletin 4/2002, Looking for the Golden Country: Illegal People—Traffickers (Including Returns to China)* ¶ 2.16 (Aug. 2002), http://www.ind.homeoffice.gov.uk/ind/en/home/∅/country-information/bulletins/china_extended_bulletin4.html, which apparently Lian did not have (more on this later). So when the Chinese government is informed (if it hasn't been already) that the United States wants to return Lian to China because he entered the United States without proper documentation, it may smell a rat, look for a record that Lian had permission to emigrate, find that he didn't, and infer that he emigrated without permission. Of course the fact that Lian was being deported wouldn't prove that he had emigrated; he might just have failed to obtain a visa to visit the U.S. as a tourist. But if the Chinese government investigated, it would discover that he had indeed emigrated; you don't go to the snakeheads to get a tourist visa.

The fact that Lian might be prosecuted for illegal emigration would not in itself raise the spectre of torture or even amount to persecution, *Li v. INS*, 92 F.3d 985, 988 (9th Cir. 1996) (a separate issue—Lian has abandoned his claim for asylum as a victim of persecution). But he submitted evidence that many illegal emigrants, upon their return to China, are detained and that detainees in China are some-

times tortured. Article 14 of the Law of the People's Republic of China on the Control of the Exit and Entry of Citizens, http://www.novexcn.com/entry_exit_citizens.html, specifies as a sanction for illegally leaving the country administrative detention for up to 10 days. Whether Lian would actually be detained, if so for how long (it could, as we'll see, be longer than 10 days, maybe much longer), and what would happen to him during his detention—specifically, whether he would be tortured (for the evidence does not indicate whether persons detained as illegal emigrants are likely to be among those detainees who are tortured)—and whether in sum it is more likely than not that he will be tortured if he is sent back to China, we do not know but need not try to determine. The immigration judge's conclusion that Lian is unlikely to be tortured or even detained is vitiated by the fact that the only reasons given by the judge for his ruling have no support in the record.

The judge wrote quite a long opinion, but most of it is taken up with irrelevancies, such as whether Lian had lied when he said he didn't know the names of all the airlines on which he flew in his many-monthed hegira from China to the United States. The only question presented by his claim for relief under the Convention Against Torture is whether he is likely to be tortured if he is sent back to China, and in answering this question "no" the judge gave only two reasons, neither connected with Lian's credibility as a witness or lack thereof. The first was that since Lian was traveling on a valid passport, there was no reason to believe the Chinese government would discover that he was trying to emigrate illegally. That we know is false; and we are surprised that an immigration judge would not know this. The second reason the judge gave was that according to a State Department report on China, "minors have been

exempt from reprisals" for attempting to emigrate illegally. Lian was 17 when he left China. The immigration judge did not say what he thought the age of majority is in China, but the government in its brief notes that 22 is the minimum age of marriage for Chinese males. The government argues that the judge didn't actually find that Lian was a minor, just that he was "young." The argument is disingenuous; the lawyers representing the government had represented to the immigration judge that Lian was a minor and the judge expressed no disagreement with the government's representation.

It is remarkable that the question whether Lian is a minor for purposes of criminal liability under Chinese law was left in the air like this. Our immigration judges are, or at least ought to be, knowledgeable about foreign countries— at the very least they should know how to find the answers to elementary questions of foreign law. The government's reference to the marriage age should have alerted the immigration judge to the need for further research, since the natural inference is that the high age of marriage is connected to China's "one-child" policy rather than to any notions of criminal responsibility. Our own research reveals that the age of adult criminal responsibility in China is only 16. Article 17 of the Criminal Code of the People's Republic of China, in *The 1997 Criminal Code of the People's Republic of China: With English Translation and Introduction* 38 (Wei Luo trans. 1998). Lian was not a minor when he decamped from China.

This is not to say that Lian has proved his case under the torture convention. The treatment of repatriated Chinese by their government is to a considerable extent a mystery. According to one report, returnees who had emigrated illegally are not subjected to the published criminal laws, but instead to guidelines that are "*neibu*"—a word that means

"internal" and refers to rules intended for circulation only within government and Communist Party organizations. U.S. Citizenship and Immigration Services, *China: Repatriated Illegal Emigrants* (Dec. 17, 1998). This is rather ominous—people subjected to secret law are especially likely to be mistreated. We have no idea what the age of majority is for *neibu* purposes, but it would be unlikely, to say the least, that a body of secret law would be scrupulous about protecting the interests of youthful offenders.

We noted earlier that it seems that an illegal emigrant under Chinese law is anyone who leaves the country without permission. According to a report by the State Department entitled *China: Profile of Asylum Claims and Country Conditions* 35 (Apr. 14, 1998), permission requires not only a passport but also an exit permit, and as far as we can tell Lian did not have an exit permit. The *Profile* also says that "many" Chinese citizens "who have entered other countries or territories illegally," as Lian did when he arrived in the United States without valid travel documents, are "subjected to lengthy administrative detention or reeducation through labor camps." *Id*. at 41. This seems another sinister example of the operation of *neibu* rules. To add to the confusion, the United Kingdom believes that "the Chinese government does not generally mistreat returnees [who had left illegally], unless the person has been deported to China more than once." Country Information & Policy Unit of the Home Office (UK), Asylum and Appeals Policy Directorate, *China Country Report* (Oct. 2003).

The State Department, relying on interviews conducted by U.S. consular officials who regularly visit Fujian, which is Lian's home province—and, not incidentally, also a source of much illegal emigration—confirms that China knows about, and on their return questions, repatriated citizens who left the country illegally. These returnees are generally

fined between the equivalent of $600 and $6,000. We don't know what happens to those who can't come up with the money, a category that may well include Lian. And recall the statement in the State Department's *Profile* that many returnees are subjected to lengthy administrative detention or to compulsory reeducation in forced-labor camps—this despite Article 14's 10-day limit. Given that returnees are handled under *neibu* rules, it is not surprising that the 10-day limit is not always honored. "Confusion over the penalties and conditions awaiting returnees is one of the difficulties faced by recipient countries' governments in returning [asylum seekers] to" China. British Home Office Report on Asylum in the UK, *China Extended Bulletin 4/2002*, *supra.*

China has a dismal human-rights record, and Lian (unlike the petitioner in *Wang v. Ashcroft*, 368 F.3d 347, 350-51 (3d Cir. 2004); cf. *Wang v. Ashcroft*, 320 F.3d 130, 144 n. 20 (2d Cir. 2003); *Pelinkovic v. Ashcroft*, *supra*, 366 F.3d at 547) presented evidence, none of which the immigration judge mentioned, that, in the words of Amnesty International, "torture is widespread and systemic" in China. Amnesty International, *Torture—A Growing Scourge in China—Time for Action* (Feb. 12, 2001), http://web.amnesty.org/library/ print/ENGASA170042001. One would expect torture to be particularly common in places of detention that exist outside the ordinary legal system and are governed instead by *neibu* rules (although one student of Chinese torture believes that it is equally common in the ordinary prisons, Randall Peerenboom, "Out of the Pan and Into the Fire: Well-Intentioned But Misguided Recommendations to Eliminate All Forms of Administrative Detention in China," 98 *Northwestern University Law Review* 991, 1038, 1045 (2004)). Even though hundreds of thousands of persons are confined in forced-labor camps throughout China, the Chinese government takes the position that these camps are not

prisons, and so refuses to allow inspections of them.

How one translates all this vague information into a probability that Lian will be tortured (remember the test is "more likely than not") is a puzzler. Maybe probability is the wrong lens through which to view the problem. "More likely than not" is the definition of the standard burden of proof in civil cases (the "preponderance" standard) and rarely is the trier of fact asked to translate it into a probability (i.e., more than 50 percent). Maybe some strong suspicion that Lian is at risk of being tortured if he is returned to China would persuade the immigration authorities to let him stay. But these are puzzles for the immigration judge to try to unravel in the first instance, and not a reviewing court. *Niam v. Ashcroft*, 354 F.3d 652, 656 (7th Cir. 2004); *Hernandez-Barrera v. Ashcroft*, No. 02-2513, 2004 WL 1300049 (1st Cir. June 9, 2004); *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002). The immigration judge failed to give the issue a responsible analysis. That is to put it mildly. Lian's counsel presented a huge mass of evidence bearing on the only issue in the case, which is whether he is more likely than not to be tortured if he is forced to return to China. Here is a partial list of the documents he submitted (only a few of which we have discussed): (1) news articles from Chinese newspapers (1996-1999) stating that repatriated Chinese citizens (typically from Fujian province) are jailed upon their return to China; (2) a report, published in 2000 by Human Rights in China, on China's implementation of the Torture Convention that discusses detention pursuant to "custody and repatriation" and the prevalence of torture in the prison system; (3) a report by Human Rights Watch on prison conditions in China in 1997 and 1998 that mentions an "endemic problem of torture and ill-treatment in the country's prisons and detention facilities"; (4) an article by the Laogai Research Foundation

(a U.S.-based NGO that compiles information about China's forced labor camps) about the fate of a political activist who was returned to China and forced to work in the labor camps; (5) an article written by American human rights activist Harry Wu about organ harvesting and "thought reform" in China's forced labor camps; (6) a list of the forced labor camps in Fujian province; (7) an article from the *Seattle Post-Intelligencer* about the punishment facing hundreds of Chinese from Fujian Province who had been smuggled by boat to British Columbia, when they are returned to China; (8) an Amnesty International report on China's "extensive use of torture— from police to tax collectors to birth control officials"; (9) a 1998 *Washington Post* article on the number of people who have been tortured to death by police in China; and (10) a 1995 report by Human Rights in China that gives a prisoner's first-hand account of being tortured in two Chinese detention centers. All this material (and more) was, so far as we can determine, completely ignored by the immigration judge.

The order of removal is vacated and the case remanded. As in a number of recent cases, the inadequate performance by the immigration judge leads us to recommend that the case be reassigned to another immigration judge. E.g., *Guchshenkov v. Ashcroft*, 366 F.3d 554, 560 (7th Cir. 2004); *Niam v. Ashcroft*, *supra*, 354 F.3d at 660-61; *Arulampalam v. Ashcroft*, 353 F.3d 679, 688-89 (9th Cir. 2003).

A true Copy:

    Teste:

                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*