PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LI FANG LIN, a/k/a Lifang Lin,
                    *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 06-1456

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A97-384-744)

Argued: October 30, 2007

Decided: February 20, 2008

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge,
and Louise W. FLANAGAN, Chief United States District Judge for
the Eastern District of North Carolina, sitting by designation.

Petition for review granted; vacated and remanded by published opinion. Chief Judge Williams wrote the majority opinion, in which Judge Flanagan concurred. Judge Traxler wrote a separate dissenting opinion.

## COUNSEL

**ARGUED:** Yee Ling Poon, New York, New York, for Petitioner. Mona Maria Yousif, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for

Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

WILLIAMS, Chief Judge:

Li Fang Lin, a citizen of the People's Republic of China, petitions for review of a final order of the Board of Immigration Appeals ("BIA") denying her applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). Lin's applications for asylum and withholding of removal stem from the forced implantation of an intrauterine contraceptive device ("IUD") by Chinese officials after the birth of her first child. Her application for protection under the CAT arises from her fear of detention and torture as a result of leaving China illegally with the assistance of a snakehead.[1] The BIA dismissed Lin's asylum claim, concluding that the forced IUD insertion was not persecution under the Immigration and Nationality Act ("INA"), 8 U.S.C.A. § 1101 *et seq.* (West 2005 & Supp. 2007), and that any fear Lin had of forced sterilization in the future was unreasonable. Based on its finding that Lin failed to satisfy the lower burden of proof required for asylum, the BIA also dismissed her withholding of removal and CAT claims. For the following reasons, we grant Lin's petition for review on all claims and remand for further proceedings consistent with this opinion.

I.

A.

When, as here, the BIA does not expressly adopt any portion of the Immigration Judge's ("IJ") decision, we review only the findings and

---

[1]A "snakehead" is a professional smuggler of Chinese migrants. *Chen Lin-Jian v. Gonzales*, 489 F.3d 182, 186 n.1 (4th Cir. 2007).

order of the BIA, not those of the IJ. *Huaman-Cornelio v. B.I.A.*, 979 F.2d 995, 999 (4th Cir. 1992).

The BIA expressly declined to address the IJ's determination that Lin's testimony was incredible.[2] We have not yet had occasion to answer the question of how we should evaluate the petitioner's testimony in such circumstances. In similar situations, our sister circuits have presumed the petitioner to be credible and have reviewed only whether the petitioner satisfied the burden of proof. *See Ying Zheng v. Gonzales*, 497 F.3d 201, 203 (2d Cir. 2007)("[B]ecause the BIA specifically declined to address the IJ's adverse credibility determination, we must evaluate [Petitioner]'s claims on the presumption that she was credible and review only the burden of proof finding."); *see also Zhen Hua Li v. Att'y Gen.*, 400 F.3d 157, 163 (3d Cir. 2005)("[W]here the BIA makes no findings on the credibility issue, we must proceed as if [petitioner's] testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of the assumed (but not determined) credibility.")(internal quotation marks and citations omitted); *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005)(same). We agree with the approach of our sister circuits and adopt it in this case. We therefore presume that the testimony of Lin, the only witness at her removal hearing, was credible.

## B.

Lin was a lifelong resident of the Fujian Province on the southeast coast of China. Fujian Province "has been known for being a place where the [one-child] policy has been enforced with special vigor"—a reputation that persists still today.[3] (J.A. at 254.) Local officials in

---

[2]Accordingly, Lin's challenge to the IJ's adverse credibility determination is not before us.

[3]Rule #11 of Fuzhou City's Enforcement of the "Fujian Province Family Planning Regulations" states that "[c]ouples belong[ing] to agricultural households have to undertake: IUD insertion after giving birth to one child; sterilization operation after having two children; manual abortion if pregnant out-of-planning." (J.A. at 181.); *see also Shou Yung Guo v. Gonzales*, 463 F.3d 109, 113 (2d Cir. 2006) (noting that a 1999 document entitled "Q & A for Changle City Family-Planning Information Handbook" states that "[a]n IUD insertion is mandatory upon birth of a first child; sterilization upon birth of a second child.").

Fujian Province have employed unspecified measures to deal with out-of-plan pregnancies, and, notwithstanding a purported national policy to the contrary, forced sterilization and abortion are prevalent in rural areas. U.S. Dep't of State Country Reports on Human Rights Practices for 2006 (China), *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm (released March 6, 2007).[4] In fact, in 2006, officials in Fujian Province "reportedly forcibly sterilized women." *Id.*

Lin married her husband Li Wei on September 28, 1998, when she was 21 years old. The couple lived with Li Wei's parents in Nan Seng village, also within Fujian Province. Lin gave birth to the couple's first child, a girl, on October 20, 1999.

In January 2000, about three months after the birth of Lin's and Li Wei's daughter, the local family-planning cadre, acting pursuant to China's "one-child" policy but against Lin's will, fitted her with an IUD to prevent further pregnancies. The record does not provide details about the circumstances of the IUD insertion because the IJ declined to hear Lin's testimony about the IUD insertion procedure. At the hearing, Lin's counsel asked her to "describe . . . the procedure of the IUD insertion." (J.A. at 114.) Before Lin could respond, the IJ instructed, "That's okay, counsel. You can move on to the next question." (J.A. at 114.)

Despite her awareness of the Chinese Government's family-planning policy, Lin desperately wanted to give birth to a boy. The reasons were many. She and her husband wanted a boy to carry on the family name, to help care for them when they became old and could no longer care for themselves, and for ancestral worship purposes after they died. The cadre, however, told Lin that she could not have another child for five years, and Lin feared that the cadre's policy "would change for the worse," (J.A. at 338), requiring her to use the IUD for an even longer period. Thus, after an IUD inspection in January 2001, Lin had the IUD secretly removed by a private doctor without the permission of the family-planning cadre. Shortly thereaf-

---

[4]The Department of State's Office of Country Reports and Asylum Affairs specifically referred the IJ to the current Country Reports for adjudication of this case.

ter, in April 2001, Lin became pregnant with a second child. Upon learning of her pregnancy, Lin moved to her aunt's home in Bian Lan village, roughly a two-hour trip by car from Lin's former home in Nan Seng, in an effort to conceal the pregnancy from the local family-planning officials. On January 8, 2002, Lin, still in hiding at her aunt's house, gave birth to a second daughter.

Because Lin did not attend her regularly scheduled checkups, the cadre began to look for her in Nan Seng. On several occasions, the cadre visited her in-laws' home in the village. Lin's husband told the cadre that Lin had gone to visit her relatives, but the cadre did not believe him and told him that he would be in trouble if Lin was found.

Local Chinese authorities in Lin's home village learned about the existence of the couple's second child when Lin's husband brought the baby to Nan Seng to visit his parents in March 2003. Lin testified that her husband took the baby to Nan Seng rather than having her in-laws visit the baby in Bian Lan because it was too difficult for her aging in-laws to make the trip over rural roads and because her in-laws felt that it was inappropriate under Chinese customs for them to visit the baby at the house of a relative on Lin's side of the family.[5]

---

[5]According to Lin, in Asian cultures, daughters leave their family to join their husband's family once they marry. Indeed, Lin is registered in her husband's household. Lin further claims that the relationship between a daughter-in-law's relatives and her husband's family is "not just a question of manners, but of codes, rules, and customs deeply ingrained in the way the society is formally structured and in the people's mentality." (J.A. at 15.) Under such customs, Lin's daughter belonged to the household of Lin's parents-in-law, and it would have been "inappropriate in the sense of being wrong, unacceptable, or even proscribed" for Lin's in-laws to visit their own granddaughter in a different household, i.e., the home of Lin's aunt. (J.A. at 15.)

The IJ dismissed Lin's explanation, stating "[c]ertainly a two-hour car drive and a slight breech [sic] of manners would not be inappropriate in order to protect a loved one from danger." (J.A. at 77.) Judge Posner has noted that a "lack of familiarity with relevant foreign cultures" is a "disturbing feature[ ] of the handling of . . . immigration cases." *Zhen Li Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005)(citing *Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 459 (7th Cir. 2004)). The very point of Lin's testimony was that the breach of customs would not have been "slight."

Immediately after Lin's husband and daughter left Nan Seng, the family-planning cadre visited Lin's in-laws' home. They claimed that they knew that Lin had a second child and informed her in-laws that "if [Lin] [came] back, if the government found her, she [would] be sterilized." (J.A. at 114.) The cadre threatened to destroy Lin's in-law's house and to impose fines if Lin did not report for sterilization. Lin departed China in May 2003, shortly after her husband had taken the baby to visit his parents in Nan Seng. Lin's husband has been in hiding since her departure, living with their two children at her aunt's home in Bian Lan and working in her aunt's garment factory.

In addition to her fear of forced sterilization, Lin also expressed fear that she would be fined, beaten, jailed, and/or tortured upon return to China because she came to the United States with the help of a snakehead.[6] Lin and her husband paid a snakehead approximately $8,000 to smuggle Lin into the United States. After the birth of her second child and with the snakehead's help, she obtained a passport from the Chinese Government in her own name. Lin stated that she had no trouble getting the passport because she got it "far away from [her] hometown." (J.A. at 120.) Lin left China through Fujian Province's Jiang Dong airport — an airport that is located a considerable distance from her hometown — without difficulty because only the local village officials were aware of her second child and wanted to find her. Lin eventually disposed of the Chinese passport in Malaysia, where she received a Hong Kong passport from her uncle.

---

[6]Police and other elements of the Chinese security force have employed "widespread torture and degrading treatment when dealing with some detainees and prisoners," and "[f]ormer detainees credibly reported that officials used electric shocks, beatings, shackles, and other forms of abuse." U.S. Dep't of State Country Reports on Human Rights Practices for 2006 (China), *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm (released March 6, 2007). In *Yi-Tu Lian*, the Seventh Circuit remanded a CAT claim because the IJ failed to provide meaningful analysis after the applicant presented evidence "that many illegal emigrants, upon their return to China, are detained and that detainees in China are sometimes tortured." 379 F.3d at 459.

## C.

On or about June 4, 2003, Lin attempted to enter the United States at or near the Miami International Airport without valid entry documents. The Immigration and Naturalization Service ("INS"), which has now been reorganized within the Department of Homeland Security ("DHS"), took Lin into custody at the airport. On June 10, 2003, DHS issued Lin a Notice to Appear, charging her with being subject to removal under 8 U.S.C.A. § 1182(a)(7)(A)(i)(I) (West 2005 & Supp. 2007).[7] Lin conceded removability and applied for asylum, withholding of removal, and protection under CAT.

On June 10, 2004, an IJ conducted a removal hearing in which Lin was the only witness. At the conclusion of Lin's testimony, the IJ, in an oral decision, found that Lin "ha[d] failed to meet her burden that she has suffered past persecution or that she has a well-founded fear of future persecution should she return to the People's Republic of China at the present time" and that Lin's testimony was "incredible." (J.A. at 79.) The IJ thus denied Lin's claims for asylum, withholding of removal, and protection under the CAT.

Lin timely appealed the IJ's decision to the BIA. On March 23, 2006, a single member of the BIA dismissed the appeal. In its written decision, and as noted above, the BIA expressly declined to address the IJ's adverse credibility determination. Instead, the BIA reasoned that even if Lin's testimony were taken as true, she could not meet her burden of proof. The BIA first concluded that Lin failed to establish past persecution because "the temporary nature of the IUD insertion removes it from the defined and permanent actions described as persecutory within the definition of 'refugee' set forth in section

---

[7]The Immigration and Nationality Act ("INA") provides that an alien "not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document . . ., and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General" is "inadmissible." 8 U.S.C.A. § 1182(a)(7)(A)(i)(I) (West 2005 & Supp. 2007).

101(a)(42)(A) of the [INA]" and because Lin was never forced to abort a pregnancy or undergo involuntary sterilization.[8] (J.A. at 2.)

Turning to her claim of a well-founded fear of future persecution, the BIA reasoned that, even if Lin met her burden of establishing her subjective fear, she had failed to submit any evidence that her fear of returning to China was objectively reasonable. The BIA noted that the reasonableness of Lin's fear of sterilization was undermined because Lin was never harmed after fleeing to her aunt's home to have her child and because her husband, who remained in China, had not been sterilized. It emphasized that Lin had failed to submit what it viewed as reasonably obtainable documents to corroborate her claim, such as a birth certificate for her second daughter or affidavits from her relatives. The BIA found that Lin's claim was further undermined by the fact that she freely obtained a passport and left China without encountering any problems. Finally, the BIA stated that the possibility that Lin might be subjected to criminal prosecution for leaving the country with the aid of a smuggler did not demonstrate a likelihood of persecution under the INA. Thus, the BIA concluded that Lin "failed to prove that a reasonable person in her circumstances would fear persecution if returned to China." (J.A. at 3.)

Addressing Lin's withholding of removal and CAT claims, the BIA stated:

> Inasmuch as [Lin] has failed to meet the lower statutory burden of proof required for asylum, it follows that she has also failed to satisfy the higher burden required for withholding of deportation and protection under the Convention Against Torture.

---

[8]The INA defines "refugee" as someone who is "outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A)(West 2005 & Supp. 2007).

(J.A. at 3.)

Lin timely petitioned for our review of the BIA's removal order. We possess jurisdiction under 8 U.S.C.A. § 1252(a)(West 2005 & Supp. 2007).

## II.

In her petition for review, Lin principally contends that the BIA erred in denying her asylum and withholding of removal claims because she has established both past persecution and a well-founded fear of future persecution for her resistance to China's coercive population-control program. Lin also challenges the denial of her claim for CAT protection.

## A.

The BIA's decision that an alien is not eligible for admission to the United States is "conclusive unless manifestly contrary to the law." 8 U.S.C.A. § 1252(b)(4)(C). We treat administrative findings of fact as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary."[9] 8 U.S.C.A. § 1252(b)(4)(B). We review *de novo* legal questions determined by the BIA, including claims of due process violations, *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004), affording appropriate deference to the BIA's interpretation of the INA and any attendant regulations, *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000).

An alien seeking asylum must demonstrate that she is unable or unwilling to return to her country of origin because of persecution, or a well-founded fear of persecution, on account of her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C.A. § 1101(a)(42) (West 2005 & Supp. 2007). In response

---

[9]In discussing the standard of review in its brief, the Government cites *Lopez-Soto v. Ashcroft*, 383 F.3d 228 (4th Cir. 2004). We note, however, that the panel decision in *Lopez-Soto* was vacated and thus has no precedential effect. Such a mistake is easily understood as neither Westlaw nor Lexis has flagged the case in their online search engines to indicate that it is no longer good law.

to China's "one-child" policy, Congress amended § 1101(a)(42) so that it now provides as follows:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

*Id.*

An alien seeking withholding of removal bears the higher burden of showing that it is "more likely than not" that, if removed to a particular country, her life or freedom would be threatened on account of one of the enumerated grounds. *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). An applicant seeking protection under the CAT must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (2007).

### B.

With this statutory backdrop in place, we turn to each of Lin's arguments.

Lin contends that the BIA dismissal of her asylum and withholding of removal claims was inappropriate because the BIA erred in finding that Lin did not establish a well-founded fear of future persecution.[10]

---

[10]Lin also maintains that the BIA engaged in impermissible fact-finding in violation of 8 C.F.R. § 1003.1(d)(3) (2007) when it found that Lin failed to meet her burden of proving that her subjective fear was objectively reasonable without the IJ having made this finding. The only other circuit to have considered this argument concluded, as the Govern-

When an alien has suffered past persecution, she is presumed to have the required well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1); *Gonahasa v. I.N.S.*, 181 F.3d 538, 541 (4th Cir. 1999). The burden then shifts to the Government to establish by a preponderance of the evidence either that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality, 8 C.F.R. § 1208.13(b)(1)(A), or that the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality, 8 C.F.R. § 1208.13(b)(1)(B). 8 C.F.R. § 1208.13(b)(1)(ii).

Lin contends that she suffered past persecution for resistance to China's coercive population control program through the forced insertion and mandatory continued usage of the IUD, thus entitling her to a presumption of a well-founded fear of persecution. This argument is premised on our holding in *Qiao Hua Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005). In *Qiao Hua Li*, we held that the single event of IUD

---

ment argues, that 8 C.F.R. § 1003.1(d)(3)(iv) (2007) "restrict[s] the BIA's ability to add new evidence to the record, but d[oes] not prohibit the BIA from making a factual determination . . . upon *de novo* review of the record before it." *Belortaja v. Gonzales*, 484 F.3d 619, 624 (2d Cir. 2007). Indeed, the Attorney General's comments attendant to the regulation clearly indicate that the regulation, rather than restricting the reevaluation of evidence obtained by the IJ, was intended to "prohibit[ ] the introduction and consideration of new evidence in proceedings before the [BIA]," thereby codifying existing BIA precedent holding that new facts will not be considered on appeal. Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,891-92 (Aug. 26, 2002).

In this case, the BIA found that Lin's fear was objectively unreasonable based on facts found by the IJ, i.e., (1) Lin's husband, who remains in China, has not been sterilized, and (2) Lin left China using her own passport without encountering any trouble during departure. The BIA also cited Lin's own testimony, which it assumed was credible, that she fled to her aunt's home after discovering her pregnancy and remained unharmed even after the birth. Thus, the BIA's conclusion that Lin's fear was objectively unreasonable is "properly characterized as a factual determination made upon *de novo* review of the existing record, not as an instance of independent factfinding." *Belortaja*, 484 F.3d at 625.

insertion did not constitute persecution, but we expressly left open the possibility that if Qiao Hua Li had challenged both "the required insertion *and* continuous usage of an IUD," we might have found that the IUD insertion constituted persecution.[11] *Id.* at 179 & n.5 (emphasis added).

The BIA has yet to provide a published, precedential opinion addressing whether, and under what circumstances, the forced insertion and continued usage of an IUD constitutes persecution. It thus has not afforded "the bench, the bar and potential asylum applicants [ ] guidance concerning whether and how they might approach the issue." *Ying Zheng*, 497 F.3d at 203. In Lin's case, the BIA determined that "the *temporary* nature of the IUD insertion removes it from the defined and permanent actions described as persecutory within the definition of 'refugee' set forth in section 101(a)(42)(A) of the [INA]." (J.A. at 2 (emphasis added).) This cursory statement, however, does not provide us enough information to conduct a meaningful review of the BIA's conclusion that Lin has not suffered past persecution. It is unclear from the BIA's stark invocation of the word "temporary" how the BIA factored the "temporary" nature of IUD insertion and usage into its overall persecution calculus, i.e., whether forced IUD insertion and continued usage is never persecution or whether it is not persecution only because it did not deprive Lin of a significant portion of her reproductive life. *See Qiao Hua Li*, 405 F.3d at 177 (4th Cir. 2005) (stating that persecution "involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee def-

---

[11]In this case, Lin's affidavit asserted not only that she was "forced to have an IUD inserted," but also that she was "required to attend the IUD checkups regularly." (J.A. at 406.) Lin also noted that she and her husband "could not live this way forever" because they were "still young" and "wanted to have more children, especially a male to carry on the family name and for ancestral worship after [they] die[d]." (J.A. at 406.) Thus, unlike the applicant in *Qiao Hua Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005), Lin does allege that she "has suffered persecution from the forced insertion and continued usage of the IUD." (Appellant's Br. at 43.) And, whereas Qiao Hua Li voluntarily chose to leave the IUD in place once in the United States, Lin hired a private doctor to have the IUD removed while still in China.

inition"). "It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, we cannot review the BIA's decision because the BIA has given us nothing to review. We would run the risk of violating fundamental separation-of-powers principles if we attempted to divine the BIA's thoughts on this matter and tried to build a legal conclusion in a veritable vacuum where BIA interpretation should always first exist. Our better judgment keeps us from such overreaching here.

Accordingly, we vacate the BIA's denial of asylum to Lin and remand for proceedings consistent with this decision.[12] The BIA dis-

---

[12]Our good colleague in dissent believes that Lin will be unable to establish a prima facie case for asylum eligibility because there is no evidence to suggest that her IUD insertion resulted from "other resistance" to China's coercive population control policy. (Dissenting Op. at 22.) Citing to our decision in *Hussain v. Gonzales*, 477 F.3d 153 (4th Cir. 2007), the dissent suggests that this case presents one of the "rare circumstances" spoken of in *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002)(per curiam) (internal quotation marks omitted) and *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam) (internal quotation marks omitted), in which remand to the BIA is not required. In *Hussain*, we concluded that, on the particular facts of that case, remand was unnecessary "[b]ecause the result of a remand to the Board [was] a foregone conclusion such that remand would amount to nothing more than a mere formality." *Hussain*, 477 F.3d at 158. Of course, whether remand is necessary in a case is dependent on the facts and legal posture of that particular case. This is especially true when the issue at hand has not been addressed on all sides by the BIA, such as is the case with the question of what constitutes "other resistance to a coercive population control program." 8 U.S.C.A. § 1101(a)(42)(B). Indeed, to the extent that the BIA has addressed the issue, it has suggested that the term "resistance" should be construed broadly to "cover[ ] a wide range of circumstances, including expressions of general opposition, attempts to interfere with enforcement of government policy in particular cases, and other overt forms of resistance to the requirements of family planning law." *In re S-L-L-*, 24 I. & N. Dec. 1, 10 (BIA 2006)(en banc).

The Eleventh Circuit has noted that a petitioner's claim that "she was forced to undergo an atrocious injection procedure to which she fought

missed Lin's withholding of removal claim solely because it found that she failed to meet the lower burden of proof for asylum. Because of our conclusion as to Lin's asylum claim, we must also vacate the BIA's decision dismissing her withholding of removal claim and remand that claim as well.[13]

We also wish to note that the BIA decision was signed by a single member, which means that it is not afforded precedential status by the BIA. 8 C.F.R. § 1003.1(e)(6)(ii) (2007). At least two of our sister circuits have held that nonprecedential decisions by a single member of the BIA should not be accorded deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Rotimi v.*

---

back by kicking and screaming" could constitute such "other resistance." *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1203 (11th Cir. 2005). In this case, we do not know what happened during Lin's IUD insertion because Lin was not allowed to testify about the IUD insertion procedure. *See infra* Part II.C. She thus was deprived of her opportunity to explain the circumstances of her IUD insertion, including the opportunity to recount any resistance that she might have offered to the procedure.

Given that the Supreme Court in *Ventura* and *Thomas* has stated in no uncertain terms that remand is *ordinarily required* when the BIA has not addressed an issue in the first instance, we tread on dangerous ground when we decide an issue that the BIA has not yet considered. With this in mind, we think it the more prudent course to address only what the BIA addressed, and not speculate about what the BIA *might* think. Accordingly, we find that remand is appropriate so that the BIA may first consider whether Lin's IUD insertion was because of "other resistance," a mixed question of law and fact committed to the BIA's expertise.

[13]We also think that the BIA erred in finding that Lin's subjective fear of future persecution was objectively unreasonable. Because the BIA did not expressly address the IJ's adverse credibility determination, we presume that Lin was credible. Viewed in this light, and assuming that she has met her burden of proving her subjective fear of returning to China (as did the BIA), the evidence of the threats of forced sterilization made by the cadre to Lin's in-laws, when combined with the knowledge that forced sterilizations are prevalent in Fujian Province, not only supports but also compels reversal of the BIA's finding that Lin's fear was not objectively reasonable. In our view, fear in the face of forced sterilization is objectively reasonable.

*Gonzales*, 473 F.3d 55, 58 (2d Cir. 2007)(per curiam)(holding that "the opinion here [by a single member of the BIA] does not merit *Chevron* deference"); *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1014 (9th Cir. 2006)(same). We need not decide today whether we must afford deference to a single member BIA decision, for on remand, the BIA can, if necessary, bring its full attention to bear on the important issue of whether Lin's forced IUD insertion constituted persecution under the INA.[14] If the BIA does address this in a precedential decision, there is no doubting that we will owe the decision deference. *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)(directing that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication" (internal quotation marks and citations omitted)).

### C.

Lin also asserts that she was denied due process when the IJ refused to allow her to testify about the IUD insertion procedure. In *Qiao Hua Li*, we also left open the possibility that we might have found that the IUD insertion constituted persecution "if the record contained evidence of forcible mistreatment or physical abuse of [Qiao Hua] Li during the IUD insertion." *Id.* at 179. The Government contends that Lin's claim, like the claim in *Qiao Hua Li*, fails for a lack of evidence that she underwent anything but "a medically routine insertion . . . which typically does not cause pain or lasting side effects." *Id.* at 179. But when Lin's attorney asked her to describe the IUD insertion procedure, the IJ did not allow Lin to so testify and instructed counsel to "move on." (J.A. at 114.)

Although the Government is correct that aliens illegally in this country do not have a fundamental right to remain, *Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 (1952), aliens are entitled to the constitutional protections of the Due Process Clause, *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). *See also Rusu v. I.N.S.*, 296 F.3d 316, 320 (4th Cir. 2002)("Deportation and asylum hearings . . . are subject

---

[14]We note that on remand the BIA might also find it necessary to ascertain whether Lin's IUD insertion was imposed "for other resistance to a coercive population control program."

to the requirements of procedural due process."). Lin argues that due process requires that she be given a "full and fair hearing" in her removal proceeding. The BIA itself has stated that the IJ must "ensure that the applicant presents [her] case as fully as possible and with all available evidence." *In re S-M-J-*, 21 I. & N. Dec. 722, 729 (BIA 1997) (internal quotation marks and citations omitted).

In its decision, the BIA did not address Lin's due process claim. It may be that Lin's counsel's failure to object to the judge's curtailment of her testimony forecloses appellate review of this claim. Indeed, the BIA has held as much before. *See Essome v. I.N.S.*, No. 98-2033, 1999 U.S. App. LEXIS 3713, at \*5 (4th Cir. Mar. 9, 1999)(unpublished)("The BIA found that Essome's failure to object to the IJ's disruption and curtailment of her testimony foreclosed appellate review of the claim.") But the BIA has not so held in *this* case because it has not addressed the issue. Because it is committed to the BIA to resolve in the first instance issues relating to asylum requests, we decline to decide Lin's due process claim and leave it for the BIA to address, if necessary, on remand. *See Gonzales v. Thomas*, 547 U.S. 183, 186 (2006)(per curiam)("A court of appeals 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.' Rather, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" (quoting *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002)(per curiam))).

D.

Finally, Lin contends that the BIA erred in dismissing her CAT claim. Lin applied for protection under the CAT based on her fear that she will be jailed and tortured upon return to China because she came to the United States with the help of a snakehead. Lin concedes that her CAT claim is not related to China's coercive population-control policy. The BIA dismissed Lin's CAT claim because she failed to carry her burden of proof with respect to her asylum claim: "Inasmuch as the respondent has failed to meet the lower statutory burden of proof required for asylum, it follows that she has also failed to satisfy the higher burden required for . . . protection under the Convention Against Torture." (J.A. at 3.)

We have noted, however, that "CAT has a standard independent from the standard for determining an asylum claim," *Camara*, 378 F.3d at 372, so it does not *follow* that denial of asylum requires denial of CAT relief. "Because the CAT inquiry is independent of the asylum analysis, . . . the BIA's decision [as to asylum] should never, in itself, be determinative of the alien's CAT claim." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 184-85 (2d Cir. 2004). Indeed, given that CAT relief lacks a subjective element, focuses broadly on torture without regard to reasons for that treatment, and requires a showing with respect to future, rather than past treatment, *id.* at 185, "the CAT and asylum analyses focus on different elements and . . . must be treated independently." *Camara*, 378 F.3d at 372 (quoting *Ramsameachire*, 357 F.3d at 184).

When the BIA misapplies the law addressing a CAT claim (or any other claim, for that matter), "the appropriate remedy is to remand so that the agency may apply the correct legal standard in the first instance." *Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006); *see also Ventura*, 537 U.S. at 16 (explaining the "ordinary remand rule"). Remand is necessary here because the BIA failed to apply the correct legal standard to the CAT claim when it treated Lin's failure to meet the lower statutory burden of proof required for asylum as determinative of the CAT claim.[15] We therefore remand Lin's CAT claim so that the BIA may apply the appropriate legal standard.

---

[15]In cases where the BIA has relied on an adverse credibility determination to defeat both an asylum claim and a CAT claim, we have required an applicant to present other evidence to support her CAT claim before granting her petition for review. *Chen Lin-Jian*, 489 F.3d at 193; *Camara v. Ashcroft*, 378 F.3d 361, 372 (4th Cir. 2004). This rule is inapplicable here because the BIA did not rely on an adverse credibility determination to reject Lin's CAT claim. In any event, the record contains evidence that illegal emigrants are imprisoned upon return to China, as well as a press release and several news articles concerning an Amnesty International report that notes that torture is widespread and systemic in the full range of China's state institutions including prisons. The Government insists that these articles "hardly establish[ ] by a clear probability that Lin would be tortured." (J.A. at 41.) However, as Lin has presented *some* evidence, we are not empowered to apply the correct legal standard in the first instance. *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002)(per curiam).

                                 III.

   For the foregoing reasons, we grant Lin's petition for review of the
BIA's final order of removal. We remand to the BIA for such further
proceedings as may be appropriate.

                         *PETITION FOR REVIEW GRANTED;*
                              *VACATED AND REMANDED*

TRAXLER, Circuit Judge, dissenting:

   I would deny Lin's petition for review of the BIA's denial of her
claims for asylum, withholding of removal, and relief under the CAT.
The BIA's eligibility determination is "conclusive unless manifestly
contrary to law." 8 U.S.C.A. § 1252(b)(4)(C) (West 2005). Because
the BIA's decision, in my opinion, is not manifestly contrary to law,
I respectfully dissent.

   The BIA concluded that Lin failed to carry her burden of proving
"refugee" status, *i.e.*, eligibility for asylum under the INA. *See* 8
C.F.R. § 208.13(a) (2007); *Dankam v. Gonzales*, 495 F.3d 113, 115
(4th Cir. 2007). The INA defines a "refugee" as an individual "who
is unable or unwilling to return to" his homeland "because of persecu-
tion or a well-founded fear of persecution on account of race, religion,
nationality, membership in a particular social group, or political opin-
ion." 8 U.S.C.A. § 1101(a)(42)(A) (West 2005). The statutory defini-
tion, then, permits an alien to prove refugee status by demonstrating
that she belongs in one of two categories: those who have been perse-
cuted in the past because of one of the protected grounds and those
who have a well-founded fear of future persecution based on one of
the enumerated grounds. *See Lin-Jian v. Gonzales*, 489 F.3d 182, 187
(4th Cir. 2007); 8 C.F.R. § 208.13(b). The BIA determined that Lin
failed to prove either that she suffered past persecution on account of
a protected ground or that she has a well-founded fear of such perse-
cution in the future.

                                 A.

   In determining that Lin failed to establish past persecution, the BIA
specifically concluded that an IUD insertion procedure, because of its

reversible nature, does not qualify as persecution: "Although the record indicates the respondent was required to undergo IUD insertion, the temporary nature of the IUD insertion removes it from the defined and permanent actions described as persecutory within the [INA's] definition of 'refugee.'" J.A. 2. The BIA's order does not specifically reference the "continued usage" aspect of Lin's claim; rather, the BIA rejected the narrower claim that the insertion of an IUD alone rises to the level of "persecution." Such a conclusion is certainly consistent with this court's decision in *Li v. Gonzales*, 405 F.3d 171, 179 (4th Cir. 2005).

As Chief Judge Williams rightly points out, however, *Li* left open the possibility that a compulsory IUD insertion coupled with mandatory continuous usage might be severe enough to constitute persecution under the INA. *See id.* Although there is little if anything in the record to suggest that the required regular checkups with family planning officials were any more than an afterthought to Lin's asylum claim, Lin's brief to the BIA — taking its cue from *Li* — made clear that her past persecution claim included a "continued usage" component.*

Nevertheless, even if the alleged acts qualified as persecution under the INA, I would still conclude that the BIA's decision is not manifestly contrary to the law because of Lin's failure to offer *any* evidence establishing a nexus between the IUD insertion and her own resistance to China's population control policies.

To establish eligibility for asylum based on past persecution, an alien must demonstrate that he suffered persecution *on account of* a protected ground. *See* 8 U.S.C.A. § 1101(a)(42)(A). Not every "morally reprehensible" act to which an alien is subject entitles him to "protection under the INA unless it occurs on account of one of the protected grounds spelled out therein." *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 453 (4th Cir. 2007) (internal quotation marks omitted).

---

*In the affidavit accompanying her application for asylum, Lin suggests that she removed the IUD secretly because she and her husband "did not want to wait" the five years dictated by the government before having a second child and they "were afraid the policy would change for the worse" in the interim. J.A. 406.

The protection afforded under the INA does not extend to shield an alien from all indignities that are an unfortunate part of everyday life in the alien's homeland. *Cf. Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005) ("The [INA] requires persecution to be on a discrete basis and to fall within one of the enumerated categories. This particularity demonstrates that the asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships.").

Lin seeks political asylum under the 1996 amendment to the definition of "refugee": "[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion . . . ." 8 U.S.C.A. § 1101(a)(42)(B). Lin does not claim to have undergone a forced abortion or involuntary sterilization, both of which qualify as past persecution *per se*, nor does Lin allege that she was persecuted for failing or refusing to submit to these procedures. Therefore, in order to establish past persecution, Lin must demonstrate that she was persecuted "for other *resistance*" to China's population control policy. 8 U.S.C.A. § 1101(a)(42)(B) (emphasis added). The statutory text requires that the persecution alleged by Lin must have been *on account of Lin's resistance* to China's population control program. *See Li v. Ashcroft*, 356 F.3d 1153, 1160 (9th Cir. 2004) (en banc) ("Congress determined that those who resist coercive population control policies should enjoy protection," making the question "whether [the asylum applicant's] resistance motivated the government officials to harm her through the forced pregnancy examination.").

Lin's past persecution claim is premised on the insertion of an IUD following the birth of her first child and the ensuing mandatory medical checkups with family planning officials to ensure that Lin did not remove the device. In her asylum application, Lin claimed that she was "forced to have an IUD inserted" shortly after the birth of her first child, that she "was required to attend . . . IUD checkups regularly," and that "[t]he cadres told us that we could have a second child five years later." J.A. 406. Lin did not suggest that government officials physically coerced her into undergoing the IUD procedure, that she resisted, or that she was in violation of Chinese family planning law

at the time. Similarly, at the asylum hearing, Lin testified that the insertion of the IUD was contrary to her wishes, but she did not indicate that she resisted or objected to the procedure or that, prior to receiving the IUD, she had violated or opposed or resisted China's population control laws. In fact, Lin's documentary evidence suggests that her IUD insertion three months after the birth of her first child was consistent with routine protocol followed by Fujian Province family planning cadre. Fuzhou City's rules for enforcing the Fujian Province Family Planning Regulations direct that in agricultural households, IUD insertion is mandatory "after giving birth to one child." J.A. 181. Lin submitted a Department of Justice study on family planning in China indicating that "[a]fter having her first child, within three to six months a woman is required to have an intrauterine device (IUD) inserted." J.A. 233. None of the documentation offered by Lin suggests that IUD insertion is linked to resistance or opposition to China's population control program. And, Lin did not suggest that the birth of her first child was "out-of-plan" or in any way violated family planning regulations, or that, in receiving the IUD, Lin was treated differently than other first-time birth mothers who undergo IUD insertion not because of their resistance to policy but simply because it is standard operating procedure.

Although the BIA addressed whether Lin offered sufficient proof to establish past persecution, it did not specifically address whether Lin established that the alleged persecution was "for other resistance to a coercive population control program." 8 U.S.C.A. § 1101(a)(42)(B). When the BIA has not considered a given issue, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (internal quotation marks omitted). Generally, "[a] court of appeals is not . . . empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.* (internal quotation marks omitted); *cf. Li*, 405 F.3d at 178 ("[B]ecause neither the Board nor the IJ addressed the issue of whether the mistreatment Li alleges was imposed 'for other resistance to a coercive population control program,' we would be required to remand to the Board for an initial determination on that issue if it were necessary to dispose of this case.").

We recently considered the "rare circumstances" exception to the ordinary remand rule in *Hussain v. Gonzales*, 477 F.3d 153, 157-58 (4th Cir. 2007), concluding that remand to the BIA was not required where it was clear from the record that petitioner would be unable to establish a prima facie case that he was eligible for adjustment of status. Lin is in a similar position here. Not only is there no evidence to suggest that her IUD insertion resulted from her resistance, but the evidence suggests quite the opposite — that Lin's IUD insertion was standard operating procedure. Because Lin failed to produce any evidence linking her IUD procedure to "other resistance," she failed, in my view, to establish a prima facie case. Under these circumstances, remand for Lin to take another shot at her proof is neither necessary nor appropriate.

## B.

I would also deny Lin's petition for review of the BIA's conclusion that she failed to establish a well-founded fear of future persecution. The BIA's rejection of Lin's claim of a well-founded fear of future persecution is grounded largely on findings of fact, to which we accord substantial deference. The BIA's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C.A. § 1252(b)(4)(B). Having reviewed the record, I would conclude that the BIA's decision is supported by substantial evidence and I am not able to say that the BIA's conclusions are manifestly contrary to law.

## C.

Finally, I would also deny Lin's petition for review of her claim for relief under the CAT. To be eligible for relief under the CAT, Lin must demonstrate "that it is more likely than not that . . . she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Although the BIA failed to separate Lin's asylum and CAT claims, which are analytically distinct and require separate analyses, *see Camara v. Ashcroft*, 378 F.3d 361, 367-72 (4th Cir. 2004), Lin failed to submit evidence suggesting it is more likely than not that she would be tortured upon returning to China. Accordingly, I cannot find the BIA's decision manifestly contrary to law.

Based on the foregoing reasons, I respectfully dissent.